## STATE v. JACKSON.

1. There being but thirty-one jurors present, of whom twelve were out in their room on another case, the prisoner charged with murder, moved that a sufficient number of additional jurors be drawn to make a full panel. This motion was refused, and the names of the nineteen disengaged jurors were put in the hat, when the prisoner demanded that the court await the return of the other jury. This, too, was refused, and after the prisoner had accepted two jurors and before he had challenged any, the other jury returned to the court room and their names were then placed in the hat. A jury was obtained before the prisoner had exhausted his peremptory challenges. *Held*, that in these matters the Circuit Judge committed no error of law. *State* v. *Stephens*, 13 S. C., 285, approved and followed.

2. The defendant was properly not permitted to prove either by himself or by another witness a conversation which occurred between them six days before the homicide, at a time when the deceased had fired at defendant, and as to his reasons for not returning the fire.

3. Where the judge instructs the jury properly as to the law of self-defence, and then charges that if all the necessary elements of self-defence are not present, and yet the accused in sudden heat and passion, on a sudden quarrel, believing that his life was in danger, fired the fatal shot, it would be manslaughter and not murder—the defendant, on trial for murder, has no ground of complaint.

4. Where the deceased had fired at the prisoner six days before and had followed that act up with threats against the prisoner's life, the prisoner was not warranted in taking the life of the deceased, unless deceased had at the time of the homicide made some demonstration of an intention to execute his threats.

5. There being no evidence of any other act of violence than that which occurred a week before the homicide, the charge of the judge that any shooting by the deceased would not justify the homicide, was necessarily applicable to the shooting of the week before.

6. To sustain the plea of self-defence, the defendant must show not only that he believed himself to be in imminent danger of losing his life or of sustaining great bodily harm, but also that the circumstances were such as to justify a reasonable person of ordinary firmness and discretion in entertaining such belief.

Before NORTON, J., Marion, June, 1889.

Clinton P. Jackson being on trial for the murder of W. H. Brooks, the trial judge charged the jury as follows:

GENTLEMEN OF THE JURY: You are charged in the trial of one of the gravest causes that is known to the laws of the State. The defendant, Clinton P. Jackson, is charged that on the 25th day of April he wilfully murdered one W. H. Brooks. His plea is the plea of self defence.

Before I define to you the different degrees of homicide, it may be well perhaps to call your attention to one or two things suggested by the argument of counsel, among which is this : that it is almost universally acknowledged that the right of self-defence antedates constitutions and legislative enactments. That is true, and it is true of every right we have. But the right of self-defence, like every other right we have had in a state of nature, is regulated by statute; and you have to be governed, as I have to be governed, by the law as it has been enacted by the constitution and the statutes and the decisions of the courts. So that it is merely a waste of time, and sometimes it is an appeal to the prejudice of the jury, to speak of self-defence as a "God-given right." You are to look upon it as one of the municipal regulations by which we are all to be governed.

Murder is the killing of any person with malice aforethought, either express or implied. Manslaughter is the unlawful killing of another without malice, express or implied. Self-defence, as regulated by the decisions of the court, and as the law now stands in South Carolina, is where one, being without fault in bringing about the difficulty, kills the assailant, the person who kills the other believing, and having the right to believe, that he is in im-

minent danger of serious bodily harm or of life itself, and from which danger he has no other probable means of escape. That is the comprehensive definition. I will repeat it to you later on and explain it more fully.

In considering this case, you are first to determine whether the charge is true that Clinton P. Jackson killed W. H. Brooks, the person he is accused of killing, and whether the act occurred in this county, and about the time it is laid in this indictment, because time is not of essence in this crime. If the defendant here killed the deceased, then you are to inquire as to the means of the killing, the time it occurred, and take into consideration all the circumstances bearing upon the motives that actuated him at the time. The courts make this distinction: if the State, when it closes its testimony, shall have made a case of murder or manslaughter against the defendant, it is his business to show the circumstances, if he can, that will entitle him to the plea of self-defence.

Now, I will ask you to consider, in the first place, whether the crime of murder has been made out or not. You remember that in order to constitute murder, there must have been a killing of his person, and by the defendant, with malice aforethought, either express or implied. The definition of malice is very well known and understood as well by the jurors as by the lawyers or the court. Malice is an evil purpose, a purpose to do what is wrong; and every killing, when nothing more is proven, is presumed to be maliciously done. The mere fact of killing is presumptively a malicious killing, and more especially is that the case when it is done with an instrument that is likely to cause death. But when the circumstances of the killing are proven before you, then all the presumptions vanish, and you are to determine from the evidence as adduced on the stand, whether malice existed or not in the mind of the person who did the killing. Any deliberate, sedate purpose to kill another without some considerable provocation is malicious.

Now, the law says that no words will justify a killing, and that no killing is justifiable, is right in the eyes of the law, except such as the law commands. Very often a homicide is excusable when it is done in self-defence; or where it is by pure accident, it is

excusable. So you are to determine from all the circumstances whether there was at this killing, if it occurred, any circumstances which would enable you to say that it was or was not malicious. Of course, in every stage of the case you will understand that the State is to make its case out beyond a reasonable doubt. I will explain to you later what I mean by a reasonable doubt.

Then, did the defendant maliciously kill the deceased in this case? Did he have a settled purpose to kill him, and without sufficient legal provocation? If he did, then he is guilty of the highest crime charged, that is, murder. But if he did not, then you will inquire whether a case of manslaughter has been made out—whether the defendant killed the deceased without malice, express or implied. The want of malice is adjudged to exist when the killing is done in sudden heat and passion on a sudden quarrel; and although I do not see it laid down in any particular case, yet I would say further that where the defendant believed that his life was in danger, although you should come to the conclusion that a case of self-defence was not made out, and that he killed to save his own life or to preserve his life from great harm, that then it would be a case of manslaughter. Every killing is unlawful unless it is excusable or justifiable. Excusable homicide is any case of self-defence. Justifiable homicide is, as I stated to you before, where a sheriff executes a prisoner—a killing that the law commands.

The defence here is self defence. That is the plea that the defendant through his counsel sets up. If you think that either of the other degrees of homicide has been made out by the State before the defendant put up his testimony, and made out beyond a reasonable doubt, then you are to inquire whether the defendant has reduced that killing to excusable homicide in self defence. Self-defence I defined to you before. It has several ingredients. It is where one, being without fault in bringing about the difficulty, kills an assailant, then believing. and having the right to believe, that he is in imminent danger of great bodily harm or of death itself from this assault, and that he has no other probable means of escape. Your first inquiry, then, under that would be, if you conclude he did the killing, was he in fault at all in bring-

ing about the difficulty.? If he was in fault in bringing about the difficulty, then he cannot plead the plea of self-defence successfully ; but if he was without fault in bringing about the difficulty, and it is for you to say from all the testimony adduced on the stand whether he was without fault in bringing about the difficulty, then you would take the next step—was he assaulted ? Did the deceased assault him first ?

Now, that brings up a very nice question in the case, because you will discriminate very closely as to what testimony you will apply to that question. All the testimony that was adduced showing the character and the disposition and the frame of mind, both of the defendant and the deceased, is relevant to that issue. But there was some testimony introduced which is relevant to that issue alone. I refer to the testimony that was adduced this morning. That testimony was admitted because it tended to show, if believed, the state of mind in which the deceased was at the time, because it was said by the witness to have occurred just before the shooting—the frame of mind in which the deceased was when he is said to have entered the store of Seigler ; and it is one circumstance to be taken with all the other circumstances of the case to enable you to determine the probability of the truthfulness of the statement of the defendant here that the deceased first assaulted him ; or the truthfulness of the statement of that witness who said that the deceased was not in a position to assault the defendant. If you come to the conclusion from all the circumstances, all you have heard from the stand—I mean all that you have heard proven from the stand ; for you could not believe all you heard from the stand, for some of it was contradictory, you are to sift the testimony and gather what the facts are, and from the circumstances you consider proven you are to say whether the defendant here committed the first assault upon the deceased, or whether the deceased committed the first assault on the defendant.

Now, the defendant's counsel argued to you erroneously that the defendant did not have to wait to be assaulted. I charge you that he did have to wait to be assaulted ; that the threats, that the conduct of the deceased, before that time entitled him not to step up to the deceased and shoot him without the deceased

making the first assault, but it entitled him to be the more watchful and to interpret the acts of the deceased more harshly than he otherwise would have interpreted them. That is all that the threats or previous quarrels entitle the defendant to do. It is said truly by the defendant's counsel that the defendant here was not obliged to quit his business and skulk in the swamp like a coward. I charge you that he was not so obliged; but, at the same time, while he was not obliged to skulk in the swamps as a coward, but might go about his business, the law says he must allow other people to go about their business. It is for you to determine what the position of the different parties was, whether they were going about their business, whether they were seeking each other for a fight, whether the one was seeking the other or the other seeking the one, and what the conduct of the parties was. All these are questions for you; I am drawing you down to the principles of law that will enable you to determine these questions.

It was further stated that the defendant here had the right to arm himself to meet an expected assault, and that is a true proposition of law. It is not only true that he had the right to arm himself to meet an expected assault, but he had the right to carry arms—the constitutional right to carry arms at any and all times—whether he was threatened or whether he was not threatened. The constitution guarantees to each one of us the right to carry arms, whether it be for self-defence or not. Of course, the law prohibits you from carrying concealed about your person a deadly weapon, a pistol and so forth. There is no charge here for carrying deadly weapons, and no proof about deadly weapons, and nobody is asked to be punished for carrying deadly weapons. So that so far as the carrying of pistols by each party is concerned, they had the constitutional right to carry the pistols. But neither one had the right to assault the other with a pistol, and the man that did that was to blame.

Now, an assault is not only the drawing of a pistol and presenting it at you, Mr. Foreman, with an attempt to fire it at you. It is not even the presenting of an unloaded pistol. It is an act accompanied with circumstances which denote a present intention with a probable ability to do violence to the person of an-

other. So that an effort to draw a pistol by an enraged man, putting his hand in his hip pocket, might or might not, owing to the circumstances, be construed to be an assault. It would be for you to determine from all the surrounding circumstances if that were the case, whether an assault had been committed or not. It would be for you to determine from the act, from the frame of mind which the person who was accused of making the assault was in or appeared to be in, and from the apparent intention of his act, whether an assault was committed or not. You could not tell what the intention of the person was, even if he levelled a pistol at you, much less could you tell if he merely took hold of his pistol in his hip pocket, but you have to determine what his intention was from the surrounding circumstances, from the state of mind he appeared to be in.

Then, was the defendant here assaulted? You are not trying Mr. Brooks. It does not make any difference what he did. He might have shot a hundred times at the defendant here, and if the defendant was not in any danger from that shooting, and knew he was not in any apparent danger from that shooting, although murder might have been in the heart of Mr. Brooks, it would not justify him. You are not to pass upon any supposed malice in the heart of Mr. Brooks, so as to discount it against any supposed malice, or any proven malice, that might have been in the heart of the defendant. There is no discount in this case. Because two men might meet, each having the bitterest hatred in his heart, and if they went out mutually to fight, in that state of mind, no matter which killed the other, the one that did the killing would be guilty of murder. The question is not whether Mr. Brooks had malice, but whether the defendant who is on trial had malice or not.

If you come to the conclusion that the defendant committed the first assault, then his plea of self-defence is altogether gone; but if you conclude that Mr. Brooks committed the first assault, then you would inquire further whether the defendant here really believed that he was in imminent danger of serious bodily harm or of life itself from the assault that was committed upon him by Mr. Brooks. Did he believe it? You can only judge of what he believed from what he himself says, and from his conduct and

3—32

from the surrounding circumstances, as you may think they have been proven on the stand. If he believed it, then another step has been made out by him in his plea of self-defence; but if he did not believe it, then his plea of self-defence is gone.

Assuming that you will find that he believed it (not meaning that you ought or ought not so to find, but with the view of giving you the law, I will assume it for the present), then would a reasonable man placed under the same circumstances have believed the same thing?. Not whether you or you would have believed it; because one of you may be a man of extraordinary firmness, of great nerve, and not easily frightened; and another of you may be a man of timid disposition, excitable; you think the worst is going to happen on the slightest provocation. So you are not to say, "Had I been in that place, I would have acted as the defendant acted in this case;" but you are to use your judgment, and by that judgment you are to picture to your mind a man of ordinary reason, judgment, firmness, discretion, and say what that man would have done under the same circumstances in attempting to obey the law and at the same time save his own life. That is what you are to do. You are to exercise your judgment as to what a man of ordinary prudence or firmness would have done in trying to save his own life and trying to obey the law. If you conclude that a man placed under the same circumstances that you have concluded the defendant was placed under would have acted as the defendant acted, then he has gone another step further in establishing his plea of self-defence. But if you conclude that a man of ordinary prudence and firmness, attempting to preserve his own body or life, and at the same time maintaining his allegiance to the law, would not have so acted, then his plea of self-defence is gone again.

But assuming that you find that a prudent man would have so acted, then there is still one other element, I believe, in the plea of self-defence, and that is, was there any probable means of escaping? The old law books used the words "possible," "possible means of escape;" but some of the more modern cases give the definition, which under the change in the nature of offensive weapons, I think a more correct definition, as "any probable means of escape." For instance, if you were assaulted in front of this

court house by a man that had a pistol or a gun, it might be possible that you might run around the corner and escape from that man; but the probability would be that if he were a good marksman, that you would not escape, but you would more likely endanger your own life. Well, now, was there any probable means of escape? If you have already come to the conclusion that all the other elements of self defence have been made out, was there any probable means of escape? You are to take the circumstances and say whether the defendant here was so violently assaulted by Mr. Brooks that his life was in imminent peril, and that he had no probable means of escape from that assault.

In arriving at your conclusion, bear in mind that it is the duty of the State to make out its case beyond a reasonable doubt; and then when the defendant comes to make out his defence, comes to make out his defence of self-defence, it is his duty to prove it by such a preponderance of the testimony as will make you, when you come to pass on the whole case, still have a reasonable doubt as to the defendant's guilt. If you still believe he is guilty beyond a reasonable doubt, then it is your duty to say so. Anything else I might say to you would merely tend to becloud the case instead of enlightening you on the law. You will bear in mind, as I have already stated, that it is the business of the State to make out its case beyond a reasonable doubt. A reasonable doubt is such a doubt as you would act upon in your private affairs in life, a doubt for which you could give a reason, not a fanciful or chimerical doubt.

There are three forms of verdict. Either guilty, which would mean guilty of the crime charged, that is, of killing with malice aforethought, either express or implied. Or guilty of manslaughter, which would mean an unlawful killing without malice aforethought, either express or implied. Or not guilty, which would mean that the plea of self defence has been made out and that the defendant is only guilty of excusable homicide.

I am requested by the defendant to charge you:

I. "That after the difficulty on Saturday night between deceased and prisoner, if prisoner believed from the conduct and language of the deceased that deceased intended to kill him on first opportunity, he, prisoner, had a right to arm himself for the

purposes of self-defence." There is in that request to charge the declaration of a fact that there was a difficulty on Saturday night. Without charging you that there was a difficulty on Saturday night, I charge you that he had the constitutional right to bear arms. There is no charge of concealed weapons, but the prisoner had no right to prevent others from bearing arms or from going about to attend to their own business.

II. "That on casually meeting deceased, if prisoner had reasonable grounds from the previous conduct of deceased, from the various threats that deceased had recently made as to taking his (prisoner's) life, to believe that deceased meant to take his life, or to do him some grievous bodily harm, and that deceased then and there intended to execute his previous threats, prisoner was not bound to wait until he was shot before shooting deceased." I will charge you that, gentlemen. You are to take it in connection with the law as I have laid it down to you more definitely than that request lays it down.

III. "That if prisoner had reasonable grounds to believe at the time of the fatal rencontre, that deceased designed to take his life, and there was no safe way of retreat, and there was imminent danger of an immediate accomplishment of such design, prisoner might then shoot deceased in self-preservation or to save his own life." That is good law as far it goes; but that is not the whole law of self-defence. I have already given it to you, and I will not trouble you to repeat it, because I think you understand what I said to you.

IV. "That the prisoner was to be the judge of his own peril, that all the facts and circumstances then and there surrounding the parties and the situation are to be determined from the prisoner's standpoint, of course at the risk of the jury's saying whether the grounds of apprehension of immediate danger to his life were reasonable or not." I so charge you. I have already charged you to the same effect.

V. "If, at the time of the homicide, the deceased was making an actual attempt to execute his threats, or was in an apparent situation to do so immediately, and if the defendant really and honestly believed himself to be in imminent peril of his life, it is neither murder nor manslaughter, but self-defence." I cannot

charge you that except with a modification.    Add these words
to it and I will charge you that as the law.    It is the same law
I charged you before.    Add these words : "If a man of ordinary
reason and firmness would have believed the same thing."    In-
sert those words at the proper point and it will read thus : "If,
at the time of the homicide, the deceased was making an actual
attempt to execute his threats, or was in an apparent situation to
do so immediately, and if the defendant really and honestly believed
himself to be in imminent peril of his life, and if a man of ordi-
nary reason and firmness would have believed the same thing, it
is neither murder nor manslaughter, but self-defence."

VI. "That if prisoner, in observing the facts and circum-
stances constituting the apparent and immediate danger, was in
any way negligent, then at most he is guilty of manslaughter."
I so charge you, though negligence is an unusual word to be
found in this connection.    Negligence is the want of that care
and prudence which a prudent man would take in the same cir-
cumstances ; but if it were mere negligence and not malicious,
then it could be no more than manslaughter.    In regard to that
thing of negligence, the books make this distinction.    If a build-
ing is going on in a city where the streets are thronged every
day, and a workman, without caring what he did, dropped a
brick and it strikes and kills a passer-by below, the law would
presume that it was malicious, because the negligence was so
gross that he might believe, was bound to have believed, that it
was likely to cause death or serious bodily harm, and therefore
it was a malicious act.    But if it was in the streets of a town like
this on an ordinary day, when there was not much passing by,
then it would be a case of manslaughter, because in all probabil-
ity nobody would be hurt by it; but if it was in the country, away
from where anybody at all was likely to pass, and the brick was
dropped, then it might be considered a mere act of carelessness
for which the party would not be responsible.    It would be a case
of misadventure, excusable homicide, if death should ensue from it.

The defendant was convicted, and he appealed to this court
upon the exceptions substantially stated in the opinion of this
court.

*Messrs. Sellers & Sellers,* for appellant.

*Mr. Johnson,* solicitor, contra.

January 7, 1890. The opinion of the court was delivered by

MR. JUSTICE McIVER. The appellant was indicted for and convicted of the murder of one William H. Brooks, on Friday, the 26th of April, 1889, and the appeal is based upon exceptions taken to the rulings of the Circuit Judge in empanelling the jury and in excluding certain testimony, as well as to certain portions of the judge's charge to the jury.

When the prisoner was arraigned, it appearing that only thirty-one petit jurors were present, his counsel moved that the jury commissioner be ordered into court and required to draw a sufficient number of additional jurors to make up a full panel of thirty-six. This motion was refused, to which exception was duly taken, and this constitutes the basis of the first ground of appeal on this branch of the case.

When the case was called for trial, and both parties had announced themselves ready, it appeared that a jury was then in their room, engaged in the consideration of another case, whereupon counsel for the prisoner moved to await the return of the absent jury, so that the names of the entire panel in attendance on the court might be placed in the hat before commencing the drawing of the jury to be charged with the trial of this case. This motion was likewise refused, and counsel for prisoner excepted. The drawing of the jury was then commenced, and before any juror was challenged, but after two had been accepted by the prisoner, the absent jury returned into court, when their names were also placed in the hat and the drawing proceeded, and before the prisoner had exhausted his peremptory challenges (only five having been so challenged), a jury was obtained, which was duly charged with the trial of the case. The refusal of this last mentioned motion furnished the basis of the second ground of appeal.

It appeared from the testimony that on the Saturday night preceding the Friday on which the homicide occurred, that the prisoner, in company with one Rogers, had been fired upon by

the deceased, or by a party of persons amongst whom was the deceased, and in his defence the prisoner proposed to show by the testimony of Rogers, as well as by his own, what passed between himself and Rogers, not in the presence or hearing of the deceased, in regard to returning the fire, for the avowed purpose of showing that the prisoner desired to avoid taking life. Upon objection, this testimony was ruled out as mere hearsay, and not constituting any part of the *res gestae;* and this ruling affords the basis of the third and fourth grounds of appeal.

The appeal is also based upon sundry exceptions to the judge's charge, which will be hereinafter stated and considered; but as they rest upon detached portions of the charge, we think that, in justice to the Circuit Judge, his charge should be set out *in extenso* in the report of this case.

We see no error in the refusal of either of the motions made in reference to the formation of the jury. There is no statute or rule of practice, so far as we know, which requires that thirty-six, or any specific number of, jurors shall be in attendance on the court at the time a jury for the trial of a capital case is organized. If a sufficient number are present to enable the accused to enjoy all the rights guaranteed to him by the law, he cannot complain that there has been any error of law in organizing the jury for the trial of his case. He is entitled to be tried by a jury composed of twelve men, and also to the number of peremptory challenges prescribed by statute; and if these rights are accorded to him, as they undoubtedly were in this case, we do not see what ground of complaint, so far at least as numbers are concerned, he can have. Indeed, the statute (*Gen. Stat.,* § 2251) does not declare that thirty-six jurors shall be drawn and summoned, but, on the contrary, the language is: "No more than thirty-six persons to serve as petit jurors shall be drawn and summoned to attend, at one and the same time, at any court unless the court shall otherwise order." This plainly shows that whether a greater number of jurors shall be drawn is a matter left to the discretion of the court.

But without pursuing the subject further, it seems to us that the question has been distinctly decided in the case of the *State* v. *Stephens* (13 S. C., 285), where it is said: "It was not neces-

sary that the whole number of thirty-six jurors should be present at the commencement of the trial. No sanction exists for such a demand either in the statute or the authorities." The distinction suggested by counsel for appellant between that case and this, that there no motion was made to fill up the panel as was done here, does not seem to us to be well founded. In that case, objection was made to proceeding with the organization of the jury because thirty-six were not present, which practically amounted to a motion to fill up the panel. But more than this, the decision in that case was not rested upon the ground that no motion had been made to fill up the panel, but was placed distinctly upon the ground that there was no law requiring that thirty-six jurors should be present.

The next objection, based upon the fact that the names of all the jurors in attendance upon the court were not placed in the hat when the drawing commenced, cannot be sustained. We do not see how it is possible that this could have impaired or in any way affected any legal right to which appellant was entitled. It could not possibly affect his right of challenge, which it is well settled is a right to *reject* and not a right to *select* jurors (*State* v. *Wise*, 7 Rich., 412, followed in numerous cases, including the very recent case of *State* v. *Jacob*, 30 S. C., 131), as is conclusively shown by his having obtained a jury without exhausting his peremptory challenges.

The third and fourth grounds of appeal imputing error to the Circuit Judge in ruling out the testimony of Rogers and the prisoner as to what passed between them on the evening of Saturday, nearly a week before the homicide was committed, cannot be sustained. This testimony was manifestly nothing more than hearsay, and, occurring nearly a week before the homicide was committed, clearly cannot be regarded as any part of the *res gestae*. The prisoner was allowed to prove the threats alleged to have been made against him by the deceased, as well as the demonstrations of violence made by deceased on the Saturday night previous; and we can conceive of no ground upon which a private conversation between the prisoner and the witness Rogers, occurring about a week before, not in the presence of the deceased,

and not communicated to him, could be regarded as competent evidence.

The exceptions to the judge's charge are somewhat peculiarly framed, consisting, with one exception, of mere extracts from the charge, and their point can only be discovered by reading them in connection with the argument submitted on behalf of the appellant. The first exception is as follows: "The want of malice is adjudged to exist when the killing is done in sudden heat and passion, on a sudden quarrel; and, although I do not see it laid down in any particular case, yet I would say further, that when the defendant believed that his life was in danger, although you should come to the conclusion that a case of self defence was not made out, and that he killed to save his own life, or to preserve his life from great harm, that then it would be a case of manslaughter." Turning to the argument, we find that the point of this exception rests upon the assumption that the words, "although you should come to the conclusion that a case of self-defence was not made out," are parenthetical, and may, therefore, be omitted without destroying, or in any way impairing, the sense of the passage in which such parenthetical words are found; and if omitted, then the proposition of law stated was erroneous, inasmuch as it took away from the jury the consideration of the plea of self-defence. We are at a loss to conceive any authority whatever for omitting the words above quoted. We do not see any reason why those words, any more than any other words found in the extract constituting the first exception, should be omitted as parenthetical, or for any other reason. We must judge of the correctness of the charge by the language found in it, and not by omitting portions of it, or substituting other language.

It seems to us, that when that portion of the charge now under immediate consideration is read in connection with other portions of the charge, as it should be, its obvious meaning is very different from that sought to be attributed to it by the unwarranted omission of the words above quoted; and that, in fact, if there was error in it, the error was in favor of rather than against the accused. In other portions of the charge, his honor had explicitly and correctly, as we shall see, instructed the jury as to what elements were necessary to constitute self-defence, amongst which

were that the party setting up such defence must not himself be
in fault in bringing on the difficulty, and must not only believe,
but also have good reason to believe, that his own life was in dan-
ger, or that he was in danger of some serious bodily harm ; and
there can be no doubt that in the extract constituting the first
exception, the judge obviously intended to say to the jury, that
even if all the elements necessary to constitute self defence were
not present, yet if the accused, in sudden heat and passion, on a
sudden quarrel, believing that his life was in danger, fired the
fatal shot. it would be manslaughter and not murder.   This was
certainly going as far, if not farther, than the law would warrant
in favor of the accused.   We cannot see, therefore, that there is
any ground for the first exception.

    The second exception consists of the following extract from the
charge : "The defendant's counsel argued to you erroneously that
the defendant did not have to wait to be assaulted.   I charge you
that he did have to wait to be assaulted ; that the threats, that
the conduct of the deceased, before that time, entitled him not to
step up to the deceased and shoot him without the deceased mak-
ing the first assault ; but it entitled him to be the more watchful,
and to interpret the acts of the deceased more harshly than he
otherwise would have interpreted them.   That is all that the
threats or previous quarrels entitled the defendant to do."   The
precise error complained of in this exception seems to be in telling
the jury that the prisoner was bound to wait until he was assaulted
before he would be warranted in taking the life of the deceased ;
but when the language used by the Circuit Judge is taken in con-
nection with other portions of his charge, especially where he
told the jury what would constitute an assault—"it is an act
accompanied with circumstances which denote a present intention
with a probable ability to do violence to the person of another.
So that an effort to draw a pistol by an enraged man, putting his
hand in his hip-pocket, might, or might not, owing to the circum-
stances, be construed to be an assault"—it is quite clear that there
was no error in that part of the charge which constitutes the basis
of the second exception.   We do not see how the jury could fail
to understand that the judge simply meant to instruct them, that
the demonstration of violence made by the deceased towards the

prisoner nearly a week before, together with the threats made in the meantime, would not warrant the prisoner in shooting the deceased when they met in the store, unless, at that time, the deceased had made some demonstration of his purpose to execute the threats. An assault has been defined to be "an offer or attempt to do violence to the person of another in a rude, angry, or resentful manner"; and it is well settled that no words, however violent or threatening in their character, will justify even a battery, much less a homicide, unless they are accompanied with some act—some offer or attempt to do violence to the person of another.

The third exception is based upon the following extract from the charge: "Then was the defendant here assaulted? You are not trying Mr. Brooks. It does not make any difference what he did. He might have shot a hundred times at the defendant here, and if the defendant was not in any danger from that shooting, and he knew he was not in any apparent danger from that shooting, although murder might have been in the heart of Mr. Brooks, it would not justify him. You are not to pass upon any supposed malice in the heart of Mr. Brooks, so as to discount it against any supposed malice, or any proven malice, that might have been in the heart of the defendant. There is no discount in the case." Reading this language in the light of the undisputed facts of the case, as is the only proper way to do, it is impossible to suppose that the jury could have understood it as referring to anything else but the shooting which occurred on the Saturday night previous to the homicide, for there was not the slightest pretence that the prisoner had ever been shot at by the deceased upon any other occasion. So reading, it is clear that there was no error in the instruction complained of; for it simply amounted to this, that even assuming that the deceased had, on the Saturday night previous, entertained the most murderous purpose against the prisoner, that would not justify him in killing the deceased as soon as he saw him on the following Friday, unless such purpose was then manifested in some way that rendered it necessary for the prisoner to prevent the execution of such purpose by taking the life of his adversary.

The fourth and fifth exceptions need not be set out *in extenso*

here, as their sole purpose is to question the correctness of the instruction given to the jury, that in order to make out the plea of self-defence, it is not only necessary that the accused should actually believe, when he takes the life of his adversary, that his own life was in imminent danger, or that he was in imminent danger of some serious bodily harm, but the circumstances must be such as would justify a reasonable person, of ordinary firmness and discretion, in entertaining such belief. The correctness of the charge in this respect is fully vindicated . by at least two distinct decisions in this State—*State* v. *McGreer* (13 S. C., 464), where it is said: "To make out a case of self defence, two things are necessary : 1. The evidence should satisfy the jury that the accused actually believed that he was in such immediate danger of losing his life, or sustaining serious bodily harm, that it was necessary, for his own protection, to take the life of his assailant. 2. That the circumstances in which the accused was placed were such as would, in the opinion of the jury, justify such a belief in the mind of a person possessed of ordinary firmness and reason. It is not a question which depends solely upon the belief which the accused may have entertained, but the question is, what was his belief, and whether, under all the circumstances, as they existed at the time the violence was inflicted, the jury think he ought to have formed such belief." And *State* v. *Turner* (29 S. C., 44), where the Chief Justice lays down the rule in these terms: "It ought to have been left to the jury to determine, under the facts stated, if proved, whether there was great danger of bodily harm, * * * or, in other words, whether he had well grounded reasons to believe (such as would influence ordinary men) that his life or body was in danger."

The judgment of this court is, that the judgment of the Circuit Court be affirmed, and that the case be remanded to that court for the purpose of having a new day assigned for the execution of the sentence heretofore passed.