15271

CITY OF GAFFNEY v. PUTNAM

(15 S. E. (2d), 130)

238

*Mr. Grover C. Powell* of Atlanta, Ga., and *Mr. C. E. Cooley* of Anderson, appeared for appellant, with *Mr. Joseph F. Rutherford* of Brooklyn, N. Y., on brief as of counsel.

*Mr. Samuel R. Watt, Solicitor,* and *Mr. H. R. Swink*, appeared for the State.

June 2, 1941.

The opinion of the Court was delivered by MR. ASSOCIATE JUSTICE FISHBURNE.

The Circuit Court upon appeal upheld the judgment of conviction of the defendant, Shannon E. Putnam, in the Recorder's Court of the City of Gaffney, wherein he was

charged with violating an ordinance of the city, the pertinent part of which reads as follows: "Any person or persons creating any disturbing noises, or making, creating or engaging in any brawl, riot, affray; fighting or indulging in profane, obscene, abusive or vulgar language, * * * shall if found guilty, be subject to a fine * * * ."

There were two trials in the Recorder's Court. In the first trial his conviction was reversed, and a new trial granted upon appeal to the Circuit Court. We are now dealing with the second trial, in which the judgment was sustained. The defendant contends that his motion for a directed verdict of acquittal should have been granted.

The facts which were held to support the conviction of the defendant follow: Putnam is a member of a group known as Jehovah's Witnesses, and claims to be an ordained minister of the gospel. On Saturday afternoon, June 15, 1940, about 3 o'clock, he was standing upon a corner of a business street in the City of Gaffney, engaged in selling or distributing, or attempting to sell or distribute, the Watchtower Magazine, which is one of the propagandic mediums of Jehovah's Witnesses. In order to call attention to the magazine he would from time to time call out, "Religion is ruining the nations; Christianity will save the people." While he was so engaged one Ernest Fowler, as he was passing, took exception to Putnam's statement about religion. He turned, walked up to Putnam, and accosted him with the remark, "Don't repeat that statement," or with the inquiry as to what he meant by making that statement. The defendant repeated what he had said about religion and Christianity, whereupon he was immediately given a severe beating by Fowler. He was knocked down several times, and every time he got up he was knocked down again, until a crowd which had assembled stopped the fight. The evidence shows that Fowler was a much larger man than the defendant, and physically superior in every way.

Fowler testified, upon cross examination by the defendant, who was not represented in the Recorder's Court by an at-

torney, "I admit positively I was the aggressor in this assault; but you fought me back all the time. I started it.' I hit the first lick  *  *  * . You were saying 'religion was ruining the nation'; I don't see what else it could be except abusive, vulgar language."

It is true that in another portion of his testimony the witness Fowler attempted to qualify in some measure his foregoing statement. He said that when he walked up to the defendant, "We had a word or two, and he kind of turned one of his papers loose and done like this (indicating with clinched fists), and when he did I hit him. I don't know whether he was going to hit me or not. I just knocked him down a time or two, and he came back." After describing further blows delivered by him Fowler said, "I quit then and stepped back, and he never made no other attempt."

There were two or three eyewitnesses, all of whom were merchants who operated nearby stores. They testified to having heard the defendant say "Religion is ruining the nations; Christianity will save the people"; they saw Fowler walk up to the defendant and address some words to him, which they did not hear, and they witnessed the fight which immediately followed. All of them said that Fowler was the aggressor, and that he administered a severe beating to the defendant.

The chief of police, Mr. Julian Wright, was not present at the fight, but just a short time before he had passed Putnam and saw and heard his efforts to sell or distribute the Watchtower Magazine. The officer said that he at that time was not violating the ordinance, but because he had heard that some of the citizens had become offended on account of the statement made by the defendant concerning religion, he had advised him to move on, being afraid that he would get into trouble. But there is no evidence that he communicated his apprehension of danger to Putnam. The officer further stated that he reached the scene immediately after the disturbance, and that he arrested the defendant and had the warrant issued solely on account of the disorderly conduct arising from the fight. We may say in passing that Fowler

was also arrested, and paid the fine assessed against him for fighting in violation of the city ordinance.

It is entirely clear, as manifested by the record, that Fowler was the aggressor. Nor can there be any reasonable doubt but that he made the assault solely because of the statement uttered by Putnam. The testimony shows that the defendant's remark which offended Fowler was not addressed to him or to any individual personally, but to the public at large. It does not appear that he had ever seen Fowler before, or that he had any reason to believe that his words would be personally offensive to him by reason of the latter's religious views or convictions. There is no showing that the defendant's deportment was noisy, truculent, overbearing, or offensive. He indulged in no opprobrium or abuse of the public, or of Fowler. So far as the evidence shows, he wished only to interest those who passed by in his propaganda.

In the instant case the defendant was not guilty, in our opinion, of any assault, and it is clear that Fowler, who provoked the difficulty and was the physical aggressor throughout, had no reasonably well-founded apprehension of bodily harm or danger to his person. So that the real question presented by the appeal is whether the words concerning religion and Christianity, spoken under the circumstances above narrated, addressed to the public at large, constituted of themselves sufficient legal justification for the assault made by Fowler. It is plain that they do not.

In view of the fact that peace and good order forbid that individuals shall right their own wrongs, we have announced the rule in numerous cases that in the absence of statute, mere words, no matter how abusive, insulting, vexatious or threatening they may be, will not justify an assault or battery, unless accompanied by an actual offer of physical violence—although they may mitigate the punishment. *State v. Cooler,* 112 S. C., 95, 98 S. E., 845; *State v. Workman,* 39 S. C., 151, 17 S. E., 694; *State*

*v. Jacobs,* 28 S. C., 29, 4 S. E., 799; *State v. Jackson,* 32 S. C., 27, 10 S. E., 769.

■ Nor can it be successfully contended that in attempting to defend himself under the facts in this case, Putnam was guilty of assault upon Fowler. One acting in self-defense to repel an unlawful attack is not guilty of assault; he may repel force with force and continue his self-defense as long as the danger apparently continues.

■ By several exceptions, and in his printed brief, the defendant attempts to show that his constitutional rights have been violated, with special reference to religious freedom and liberty of speech and press under the First and the Fourteenth Amendment to the United States Constitution, and Article I, Sections 4 and 5 of our State Constitution. These exceptions are so indirectly connected with the issue which we have already passed upon that they hardly need be discussed. No one would deny the postulate that a state or municipality may not by statute or ordinance wholly debar the right to preach or to disseminate religious views. Clearly an absolute restraint would violate constitutional guaranties. As was said in *State v. Langston,* 195 S. C., 190, 11 S. E. (2d), 1, 2: "In this State there are so many religious beliefs, so varied in what they teach and with such great difference, that one of the most fruitful, and yet fruitless, sources of argument is some theological question. It certainly cannot be said that there is not in this State an absolute freedom of religion. A man may believe what kind of religion he pleases or no religion, and as long as he practices his belief without a breach of the peace, he will not be disturbed." And see generally *Morison v. Rawlinson,* 193 S. C., 25, 7 S. E. (2d), 635.

It must be kept in mind that the common-law offense of breach of the peace is not charged here. The charge against the defendant was founded upon the broad and general phraseology of the ordinance hereinabove set out. But in *Cantwell v. Connecticut,* 310 U. S., 296, 60 S. Ct., 900, 906, 84 L. Ed., 1213, 128 A. L. R., 1352, the Court dealt

with a case involving two members of Jehovah's Witnesses, charged with a breach of the peace. In that case the defendants, with a portable phonograph, on one of the public streets of New Haven, Connecticut, played a record which included an attack upon the Roman Catholic Church. This record gave offense to two members of that church who heard it. They made no physical attack upon the "Witnesses," but the latter were charged with a breach of the peace. We quote some portion of the opinion of the Supreme Court because the discussion has a general bearing here:

"In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that in spite of the probability of excesses and abuses, these liberties, are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

"The essential characteristic of these liberties is, that under their shield many types of life, character, opinion and belief can develop unmolested and unobstructed. Nowhere is this shield more necessary than in our own country for a people composed of many races and of many creeds. There are limits to the exercise of these liberties. The danger in these times from the coercive activities of those who in the delusion of racial or religious conceit would incite violence and breaches of the peace in order to deprive others of their equal right to the exercise of their liberties, is emphasized by events familiar to all. These and other transgressions of those limits the states appropriately may punish.

"Although the contents of the record not unnaturally aroused animosity, we think that, in the absence of a statute narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest

of the State, the petitioner's communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question."

It follows from what we have said, that the defendant's motion for a directed verdict in the Recorder's Court should have been granted.

Judgment reversed.

MR. CHIEF JUSTICE BONHAM and MESSRS. JUSTICES BAKER and STUKES concur.