No. 15,040.

HAMILTON *v.* CITY OF MONTROSE.

(124 P. [2d] 757)

Decided March 16, 1942.   Rehearing denied April 20, 1942.

Mr. L. C. KINIKIN, for plaintiff in error.

Mr. HERBERT L. STRANG, for defendant in error.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

THE cause here presented for our consideration involves the alleged violation of a city ordinance. In the complaint filed in the police court of the City of Montrose, it is charged: "That on or about the 31st day of May, A.D. 1941, David Hamilton [plaintiff in error] violated Article 177 Section 10 of Ordinance No. 190 entitled: Peace and Quiet of said city passed on the 12th day of July, A.D. 1937, in this to-wit: That the said David Hamilton did employ a loud and offensive device and performance as a means of advertising and attracting a crowd and to the disturbance and annoyance of the citizens of the City of Montrose." The language of

the ordinance upon which the complaint was based is as follows: "No person shall in the City of Montrose, use any bell, horn, bugle or other sounding instrument or employ any loud or offensive device or performance as a means of advertising or attracting a crowd, nor cry or hawk any article or goods in such manner as to attract any crowd or as to disturb or annoy any person." Upon trial in the police court Hamilton was found guilty as charged, fined ten dollars, and ordered confined in the city jail until the fine was paid, not exceeding, however, a period of thirty days. From this judgment he appealed to the county court, where, upon a trial to the court without a jury, he again was found guilty and judgment for ten dollars and costs was entered against him, to review which he brings the case here on error and applies for a supersedeas. At the request of both parties, we elect to dispose of the matter upon this application.

The facts adduced to sustain the conviction are in substance as follows: On the afternoon of the day of his arrest, plaintiff in error, a minister of the Gospel, and one Gooden, likewise a minister, were preaching about four or five car lengths from one of the banking corners on the main street in Montrose. In their preaching and announcements of religious services to be held elsewhere they were using a loud-speaker. The Chief of Police of Montrose, having received complaints from several citizens concerning the use of this loud-speaker at open-air services, spoke to Hamilton about it and asked him "if he wouldn't stop the loud-speaker," to which Hamilton replied, "No, the only way I will stop the loud-speaker is you have got to arrest me and throw me in jail. You have got to treat me like they did Apostle Paul, you have got to arrest me and throw me in jail before I will quit speaking." The Chief of Police testified that thereafter the voice coming through the loud-speaker seemed to him to be louder than before—loud enough to be heard two or three blocks away. In business houses in close proximity to where the loud-

speaker was being used it was necessary to close the doors and windows in order that the proprietors might carry on conversations with customers. The testimony concerning the bad effects of the noise on the business and professional activities of those in the neighborhood included that of a banker, a doctor, an optometrist and a jeweler. The Gospel services continued for about an hour. The Chief of Police testified further that he had a gentlemen's agreement both with the defendant and with the operator of a loud-speaker for the moving picture theatre that, so long as they kept their respective loud-speakers on the move and did not stop in any one place he would not molest them, and that he did not molest the operator of either machine so long as the latter was being moved around; that he had received no complaints about the sound machines when they were so used. Defendant Hamilton testified that, in addition to preaching over the loud-speaker, he and the Reverend Gooden made announcements of meetings to be held at the tabernacle, and that they advertised these meetings not only by such announcements, but also by passing out handbills.

██ Counsel for Hamilton contends that the ordinance in question, as applied to his religious activities in connection with which he used the loud-speaker, is unconstitutional, in that it violates the First and Fourteenth Amendments to the federal Constitution, and section 10, article II of the state Constitution which relates to the guaranties of freedom of speech and religion.

Here then is another case involving a conflict between liberty and authority, a conflict that is sometimes labeled "civil rights v. the police power" or "liberty of the individual v. the general welfare." The regulatory inhibitions and the rights on either side are, with few exceptions, not absolute. An excellent statement of the limitations which may be applied to an exercise of free speech and religion is found in *Cantwell v. Connecticut,* 310 U.S. 296 (60 Sup. Ct. 900, 84 L. Ed. 1213), in which

Mr. Justice Roberts, speaking for a unanimous court, used the following language (pp. 303, 304): "The fundamental concept of liberty embodied in that Amendment [Fourteenth] embraces the liberties guaranteed by the First Amendment. The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of states as incompetent as Congress to enact such laws. The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. No one would contest the proposition that a State may not, by statute, wholly deny the right to preach or to disseminate religious views. Plainly such a previous and absolute restraint would violate the terms of the guarantee. It is equally clear that a State may by general and non-discriminatory legislation regulate the times, the places, and the manner of soliciting upon its streets, and of holding meetings thereon; and may in other respects safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment."

It is apparent from the foregoing that each case must

be determined on its individual facts and that precautionary measures must be used to guard against two dangers: first, lest, under the guise of providing for the public welfare, the civil liberties guaranteed under our bill of rights be unnecessarily invaded or nullified; second, lest using the bill of rights as a cloak, an individual is allowed to commit a nuisance or worse against the public in general. Each case demands an examination of the realities, and the line of demarcation is continuously being traced showing where the court has in one case held that under the particular facts in that case there was an invasion of the individual rights guaranteed under the Constitution, and in another case that the individual's rights were in fact not being invaded.

The recent cases in the United States Supreme Court where the individuals' rights have been held to have been invaded have been well epitomized by the then Chief Justice Hughes in the recent case (March 1941) of *Cox v. State of New Hampshire,* 312 U.S. 569 (61 Sup. Ct. 762, 85 L. Ed. 1049) as follows: "In *Lovell v. Griffin, supra* [303 U.S. 441], the ordinance prohibited the distribution of literature of any kind at any time, at any place, and in any manner without a permit from the city manager, thus striking at the very foundation of the freedom of the press by subjecting it to license and censorship. In *Hague v. Committee for Industrial Organization, supra* [307 U.S. 496, 59 S. Ct. 964, 83 L. Ed. 1423], the ordinance dealt with the exercise of the right of assembly for the purpose of communicating views; it did not make comfort or convenience in the use of streets the standard of official action but enabled the local official absolutely to refuse a permit on his mere opinion that such refusal would prevent 'riots, disturbances or disorderly assemblage.' The ordinance thus created, as the record disclosed, an instrument of arbitrary suppression of opinions on public questions. The court said that 'uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain

order in connection with the exercise of the right.' In *Schneider v. State, supra* [308 U.S. page 163, 60 S. Ct. page 151, 84 L. Ed. 155], the ordinance was directed at canvassing and banned unlicensed communication of any views, or the advocacy of any cause, from door to door, subject only to the power of a police officer to determine as a censor what literature might be distributed and who might distribute it. In *Cantwell v. Connecticut, supra* [310 U.S., page 305, 60 S. Ct., page 904, 84 L. Ed. 1213, 128 A.L.R. 1352], the statute dealt with the solicitation of funds for religious causes and authorized an official to determine whether the cause was a religious one and to refuse a permit if he determined it was not, thus establishing a censorship of religion."

In addition to the foregoing cases the Chief Justice also referred to the recent cases of *Thornhill v. Alabama,* 310 U.S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093, and *Carlson v. California,* 310 U.S. 106, 60 Sup. Ct. 746, 84 L. Ed. 1104, in which the question of peaceful picketing was involved. See, also, *American Federation of Labor v. Swing,* 312 U.S. 321.

The foregoing decisions, however, were held by the Chief Justice to be inapplicable to the facts in the case of *Cox v. State of New Hampshire, supra.* In the latter case defendants relied upon the Fourteenth Amendment to the Constitution of the United States and argued that they had been deprived of their right of freedom of worship, as well as freedom of speech and freedom of assembly. Chief Justice Hughes upheld the validity of a municipal ordinance granting the authority to control the use by the municipality of its public streets for parades or processions, and upheld the judgment of the Supreme Court of New Hampshire, which had affirmed the conviction in the lower court of the defendant for taking part in a parade or procession upon a public street without license having first been obtained.

Likewise religious freedom has been held not infringed by a statute compelling a daily ceremony of saluting

the national flag. *Minersville School District v. Gobitis,* 310 U.S. 586, 60 Sup. Ct. 1010, 84 L. Ed. 1375.

In *Milk Wagon Drivers Union v. Meadowmoor Dairies,* 312 U.S. 287, 61 Sup. Ct. 803, 85 L. Ed. 836, an injunction confined to conduct in a narrow area affected by coercive conduct and restraining peaceful picketing was upheld as valid so long as it counteracted a continuing intimidation, and to that extent was a limitation upon the right of freedom of speech.

We believe that the facts in *Cox v. State of New Hampshire, supra,* more nearly resemble those in the instant case than any of the others above mentioned, and that we would be justified in following the decision in that case. And certainly the principle of ordered liberty with its necessary concomitant measure of control contains an excellent expression in the following words of Mr. Justice Hughes' in that case: "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions."

Fully as persuasive to us as the Cox case are the standards applied by the court in arriving at its decision in the Cantwell case, supra, as announced by Mr. Justice Roberts. First, in that case the ordinance forbade any person to solicit money, services, subscriptions or any valuable thing for any religious, charitable or philanthropic cause without first obtaining a license from the secretary of the Public Welfare Council, and provided a penalty in the event of failure to so obtain such license or certificate—thus leaving it in the discretion of one individual to grant or withhold such license as in that individual's judgment, bias or prejudice might seem best. In the instant case the ordinance forbidding the loud-sounding device is not dependent for its enforcement upon the whim of any individual, but is made general in its application in the same manner as other laws forbidding particular acts on the part of citizens. Second, in the Cantwell case Mr. Justice Roberts was careful to point out that the defendant's conduct did not amount to a breach of the peace; that it was not trucculent, and when told to move on after he had played the record, which had contained strictures against some of the organized forms of religion, defendant picked up his books and walked up the street. In the instant case we find just the opposite attitude on the part of the defendant, namely: a refusal to move on when requested to do so by the Chief of Police and a continued insistence on using the loud-speaker for his own purposes, there being some testimony, although denied by defendant, that the sounds became even louder after the Chief of Police had asked him to desist. Third, in the Cantwell case Mr. Justice Roberts was careful to point out that the sound of the phonograph used by the defendant in that case was not shown to have disturbed residents of the street, to have drawn a crowd or to have impeded traffic, and that therefore the defendant had invaded no right or interest of the public or of the men accosted; whereas in the instant case the whole gravamen of the

action would appear to be the fact that the defendant had definitely disturbed the lawful occupants and property owners of the streets in the neighborhood of the loud-sounding device.

In the instant case it seems to us worthy of comment that the testimony of the Chief of Police shows that he had a gentlemen's agreement with defendant and the operator of another loud-sounding device that they could use same on the streets of Montrose so long as they were kept moving, and this for the practical reason that when the loud-sounding devices were kept moving there seemed to be no complaint from the citizens; that the Chief of Police took action against the defendant only when the latter insisted upon stopping near one of the busy corners of the main street of Montrose where he continued to use such loud-sounding device with the result that numerous complaints came from the property owners and occupants of property in the neighborhood affected by the noise. It seems to us that here there is no evidence of unfairness of treatment or discrimination, no evidence of bias or partiality against the propagation of certain religious views. It would appear that the Chief of Police in applying a pragmatic test did not take action in this case until complaints from the citizens made it evident that the defendant was committing a nuisance.

Applying, therefore, the same standards that were used in the Cantwell case, we reach an opposite conclusion in the instant case from that announced in the Cantwell case, because of the differing facts. In the instant case the ordinance itself does not set up a religious censorship as it did in the Cantwell case—it is aimed solely at the prevention of noises that become nuisances. In the administration of the ordinance in the present case we see no attempt, overt or hidden, to override constitutional guaranties. We believe the people of Montrose have the right to protect themselves from concentrated and continuous cacophony.

The judgment of the lower court is accordingly affirmed.

Mr. Justice Bock dissents.

Mr. Justice Bock dissenting.

I dissent, for two reasons: First, the conduct of Hamilton does not constitute a violation of the ordinance involved; second, the ordinance, if construed to apply to such conduct, is unconstitutional and void, in that it abridges the exercise of freedom of speech and religion as guaranteed by the First and Fourteenth Amendments to the federal Constitution.

The legislative intent, as disclosed by the ordinance, was to regulate the sale and advertising of commodities, not to regulate the exercise of freedom of speech or religion. The only language which, if we ignore this legislative intent, may have any application to the facts before us is as follows: "No person shall in the City of Montrose, use any * * * sounding instrument or employ any loud or offensive device * * * as a means of * * * attracting a crowd * * *." The exercise of freedom of speech or religion naturally and impliedly includes the attraction of a crowd. A speech is delivered to an audience, not in a vacuum. The record is silent on whether Hamilton succeeded in attracting a crowd. The following language of the ordinance, which clearly relates to hawking any article or goods, has no application whatever to Hamilton's conduct: "No person shall * * * cry or hawk any article or goods in such a manner as to attract any crowd or as to disturb or annoy any person." That eliminates any disturbance and annoyance features from this case. There is no contention that Hamilton did not have a right to be where he was when he was preaching and making announcements of religious services. He was exercising a constitutional right, both as to freedom of speech and religion. "Wher-

ever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Hague v. C.I.O.*, 307 U.S. 496, 515, 59 Sup. Ct. 954, 83 L. Ed. 1023. See, also, *Schneider v. State*, 308 U.S. 147, 163, 60 Sup. Ct. 146, 84 L. Ed. 155. Using a loud-speaker to attract a crowd would be the only possible dereliction under the ordinance. In my opinion, the facts disclosed by the record do not constitute a violation of this ordinance. *City of Gaffney v. Putnam*, 197 S.C. 237, 15 S.E. (2d) 130.

The constitutional questions raised are of more importance. Within the last decade the Supreme Court of the United States, under the able leadership of the then Chief Justice, Charles Evan Hughes, showed in an affirmative way, how the civil liberties of the individual may be vindicated and preserved. Practically all of the cases cited in the majority opinion indicate this definite trend. What freedom of speech, the press, and exercise of religion actually mean can be determined only when these principles are tested in specific instances. The tendency now is not to widen the conflict between liberty and authority, but to reconcile the competitive relationship between these governmental principles. Would a statute or ordinance which absolutely prohibits the use of any loud-speaking device under any circumstances be an abridgment of free speech? I say it certainly would. Just as the right of free press includes the right to "distribute," so freedom of speech includes the right to be "heard." The use of a loud-speaker, under the circumstances, is not a nuisance per se. The right to its use, however, is not absolute, but is subject to reasonable legislative regulations, without an invasion of the constitutional guarantees. A loud-speaking device is a

great convenience to those who desire to hear and be heard, and bears a necessary relationship to freedom of speech. Its use may reasonably be regulated as to time, place and manner. *Cantwell v. Connecticut,* 310 U.S. 296, 60 Sup. Ct., 900, 84 L. Ed. 1213. The vice of the ordinance before us is that, when applied to the facts at bar, it absolutely prohibits the use of a loud-speaker at any time, in any manner, anywhere. *People v. Harris,* 104 Colo. 386, 91 P. (2d) 989; *Thornhill v. Alabama,* 310 U.S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093. Such an abridgment of the right of free speech or exercise of religion cannot be left to a gentlemen's agreement with a chief of police. Concepts of civil liberty, such as freedom of speech and the press, are relative and not absolute, and vary with time and circumstances; and so, amplification devices which, in recent years, have come largely into use, have their necessary place in the exercise of these constitutional rights. That a city may regulate the use of such sounding devices and protect itself "from concentrated and continuous cacophony" already has been indicated above. The inertia which sometimes exists in municipalities in protecting individual liberty must be overcome by affirmative action in the enactment of laws that will not abridge, but reconcile, the exercise of free speech and religion, with the authority to reasonably regulate it in the interest of the public safety, health, welfare or convenience, and not leave this problem to the arbitrary action of a chief of police.

An ordinance regulating commercial solicitation and canvassing is one thing, but the application of such ordinance to conduct such as that of defendant in the instant case, thereby interfering with his exercise of a constitutional right, is another. There is a difference in degree, which emphasizes the importance of protecting the individual from an invasion of his constitutional liberties as distinguished from regulating the use of sounding instruments in the sale or solicitation of commodities. *Schneider v. State,* 308 U.S. 147, 163, 60 Sup.

Ct. 146, 84 L. Ed. 155. Under the language of the ordinance in question, which is controlling, Hamilton's conduct cannot involve a breach of the peace, commission of a nuisance, disturbance or impeding traffic. There may be such ordinances in force in Montrose, and perhaps Hamilton's conduct was within their prohibition. Our concern here must solely be with the ordinance under which he was prosecuted. The utterances of defendant over the loud-speaker are not asserted to have been abusive, subversive or in any other respect unlawful.

In the Cantwell case, in the fifth count of the information, under which a conviction was obtained, defendants were charged with the common-law offense of inciting a breach of the peace. Notwithstanding defendants did something to arouse animosity, the court, in view of the invasion of the constitutional guarantees, denied liability thereunder. The court, speaking through Mr. Justice Roberts on that phase of the case, said (page 311): "Although the contents of the record not unnaturally aroused animosity, we think that, in the absence of a statute narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State, the petitioner's communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction of the common-law offense in question."

In the Schneider case the Los Angeles, Milwaukee and Worcester ordinances under review absolutely prohibited the distribution of pamphlets in the streets, and one of them in other public places. In that case the court held that the purpose of the ordinances, to keep the streets clean and of good appearance, was insufficient to justify the exertion of the police power to invade the constitutional guarantees.

The majority of the court here relies upon the case of *Cox v. New Hampshire*, 312 U. S. 569, to justify its opinion. In that case "the sole charge against appellants was that they were 'taking part in a parade or procession' on public streets without a permit as the statute required." In referring to that case in *Trujillo v. Walsenburg*, 108 Colo. 427, 118 P. (2d) 1081, we said that it contained an excellent statement of the power of a municipality to impose regulations in the use of public streets. In the Cox case, Mr. Chief Justice Hughes, quoting from the opinion of the lower court, said: "The defendants * * * 'had a right, under the act, to a license to march when, where and as they did, if after a required investigation it was found that the convenience of the public in the use of the streets would not thereby be unduly disturbed, upon such conditions or changes in the time, place and manner as would avoid disturbance.' " In that case, unlike the present one, there was a state statute conferring regulatory power as to time, place and manner of the exercise of a constitutional right. It is clear that the Cox case is in no way analogous in fact or law to the case at bar.

In my opinion, the judgment should be reversed and the case remanded, with directions to dismiss the complaint.