296 P.2d 465 (1956)
In re HEARINGS CONCERNING CANON 35 OF THE CANONS OF JUDICIAL ETHICS.
No. 17915.
Supreme Court of Colorado, En Banc.
February 27, 1956.
*466 O. OTTO MOORE, Referee.
On the 12th day of December, 1955, this Court entered the following order:
"It is this day ordered that Mr. Justice Moore be, and he hereby is, appointed referee to consider the Canons of Professional Ethics and the Canons of Judicial Ethics as found in Appendix B, of the Rules of Civil Procedure for Courts of Record in Colorado, appearing in volume one, Colorado Revised Statutes, 1953.
"Public hearings will be held before the referee in the supreme court room at 10 a. m., Monday, January 30, 1956, at which time and place anyone interested in sustaining or amending said canons is invited to attend and present his views."
Pursuant to the foregoing order, hearings were conducted following which the referee made his report to the Court, which was in words and figures as follows:
Pursuant to the order of this Court heretofore entered, the hearings upon the question as to whether the canons of professional and judicial ethics should be continued, revoked or modified, have been concluded. The first matters considered were those based upon Canon 35 of the judicial ethics which prescribes a blanket exclusion from the court room of the press photographer and operators of radio and television instruments.
Many witnesses appeared, many arguments were heard, and numerous demonstrations of modern devices applicable to photography, radio and television were performed during the extended hearing. Approximately two hundred exhibits were received, many of which were photographs taken during the hearing.
Because there are well-settled principles of law which are equally applicable to the questions raised by all who participated, I consider it advisable to point up these fundamentals at the outset, and to set them forth as clearly as possible in order that their application to somewhat differing factual situations may be more readily apparent.
The First Amendment to the Constitution of the United States provides, inter alia: "Congress shall make no law * * * abridging the freedom of speech, or of the press; * * *." The Fourteenth Amendment includes the following: "* * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States * * *." It has been held repeatedly that the latter provision has the effect of extending the guarantee of freedom of the press against congressional action to include action by state agencies as well. Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213. Hamilton v. City of Montrose, 109 Colo. 228, 124 P.2d 757.
I omit further reference to the first and fourteenth amendments to the Constitution of the United States for the reason that the provision of our Colorado Constitution is *467 more inclusive in its coverage of the subject and is equally binding upon us. Any case granting relief under the guaranty of the federal Constitution would be even more persuasive when considered in connection with the more specific language employed by the state constitution.
Article II, section 10, of the Colorado Constitution provides:
"No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; * * *." (Emphasis supplied.)
This limitation upon the power of state officials is applicable to those exercising authority in all three branches of the government and controls the scope of "judge made" law, as well as that emanating from legislative halls.
Crouch v. Central Labor Council, 134 Or. 612, 293 P. 729, 83 A.L.R. 193.
Article II, section 16, of the Colorado Constitution provides, inter alia, that:
"In criminal prosecutions the accused shall have the right to * * * a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed."
It has repeatedly been held that the right to a "public trial" is abridged if the press is excluded. Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546. Maryland v. Baltimore Radio Show, Inc., 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562. The opinion in Craig v. Harney, supra [331 U.S. 367, 67 S.Ct. 1254], contains the following significant language:
"A trial is a public event. What transpires in the court room is public property. * * * Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it."
It is equally well established that freedom of the press is not confined to newspapers or periodicals, but is a right of wide import and "* * * in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 669, 82 L.Ed. 949; Burstyn, Inc., v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098.
Tempering the effect of the foregoing is the oft repeated truism that "No freedoms are absolute." The freedoms of speech and press are not exceptions. No one denies the existence of broad powers inherent in the judiciary. This power unquestionably includes the right of the courts to determine the manner in which they shall operate in order to administer justice with dignity and decorum, and in such manner as shall be conducive to fair and impartial trials and the ascertainment of truth uninfluenced by extraneous matters or distractions. If at any time the representatives of the "press" in any field of activity interfere with the orderly conduct of court procedure, or create distractions interfering therewith, the court has the inherent power to put an immediate stop to such conduct. No claim of justification on the ground of freedom of the press would be available to those guilty of such offensive conduct.
The absolute prohibitions contained in Canon 35 of the judicial ethics have given rise to the conflict between the exercise of rights guaranteed by the constitution and the exercise of power inherent in the judiciary. As we said in Hamilton v. City of Montrose, supra [109 Colo. 228, 124 P.2d 759], "Here then is another case involving a conflict between liberty and authority, a conflict that is sometimes labeled `civil rights v. the police power' or `liberty of the individual v. the general welfare'".
The present conflict is comparable to the numerous instances in which citizens have claimed injury by alleged denial of constitutional rights resulting from restraints imposed through the exercise of the police power. The restraint will be upheld if the legislation imposing it bears a fair *468 relation to the public health, safety, morals or welfare. Lipset v. Davis, 119 Colo. 335, 203 P.2d 730. In every case the power to regulate must not be arbitrarily imposed; it must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. Every case involving such a conflict must be determined on its individual facts. In the instant case we must take precautionary measures to guard against two dangers: first, lest under the guise of preserving dignity and decorum in court cases the civil liberties guaranteed under our Bill of Rights be unnecessarily invaded or nullified; second, lest using the Bill of Rights as a cloak individuals are permitted "to detract from the essential dignity of the proceedings, district the witness in giving his testimony, degrade the court, and create misconceptions with respect thereto in the mind of the public," by the use of camera, radio or television in the course of a trial.
We are concerned with realities and not with conjecture. Canon 35 assumes the fact to be that use of camera, radio and television instruments must in every case interfere with the administration of justice in the particulars above mentioned. If this assumption of fact is justified the canon should be continued and enforced. If the assumption is not justified the canon cannot be sustained.
For six days I listened to evidence and witnessed demonstrations which proved conclusively that the assumption of facts as stated in the canon is wholly without support in reality. At least one hundred photographs were taken at various stages of the hearing which were printed and introduced as exhibits. All of them were taken without the least disturbance or interference with the proceedings, and, with one or two exceptions, without any knowledge on my part that a photograph was being taken. A newsreel camera operated for half an hour without knowledge on my part that the operation was going on. Radio microphones were not discovered by me until my attention was specifically directed to their location. Several hours were devoted to the techniques involved in modern production of live telecasts and for one whole day the events taking place in the court room were produced on a closed circuit telecast and shown as they happened on the television set in the court room. Cameras used in photo and television demonstrations were of different kinds. In still photography and newsreel activity they were not noticeable and were operated in such manner that I was unaware that they were functioning. The television cameras shown were of several kinds, varying from the large, already outmoded one which is mounted on a movable tripod, to the small one which is 4"×5"×7" in size. All equipment used, whether large or small, is capable of installation outside the court room with only the lens appearing on the exterior wall, through an otherwise concealed door or window, or from a booth in the rear of the court room. Only the regular lighting at all times functioning in the court room was used, and any court room with adequate sunlight for ordinary court proceedings would require no additional lighting. There was nothing connected with the telecast which was obtrusive. The dignity or decorum of the court was not in the least disturbed. Many persons entered and retired from the court room without being aware that a live telecast was in progress. Others who took seats which were so located that they could see the television screen which was reproducing the hearing, were obviously surprised when they observed it a brief time after being seated.
I am very sure that many well meaning persons, including some leaders of the bench and bar, are of the firm conviction that some, or all, of the prohibitions contained in Canon 35 should be continued and enforced without variation. I must confess that prior to this hearing I leaned definitely toward that view in so far as television and radio were concerned. I am equally certain that the vast majority of those supporting continuance of Canon 35 have failed, neglected, or refused to expose themselves to the information, evidence, and demonstrations of progress which are available in this field. I am also satisfied that they are unfamiliar with the actual experiences *469 and recommendations of those who have permitted supervised coverage by photographers, radio and television of various stages of court proceedings.
I do not mean to say that in every case photography, radio and television broadcasting should be permitted. There are doubtless many cases and portions thereof which, in the court's discretion to insure justice, should be withdrawn from reproduction by photo, film, radio or television. The responsible leadership in each of these fields are in agreement that the trial court should have complete discretion to rule out all, or any part of, such activity in those instances where the proper administration of justice requires it.
Arguments and suggestions of various kinds have been submitted to me in various ways in support of the retention of Canon 35. Generally they fall into one or more of the following classifications. A brief discussion on each may be of assistance.
(1) It is claimed that permitting photographs, newsreels, radio and telecasts of court proceedings amounts to entering the field of entertainment and is not strictly within the field covered by the term "freedom of the press." The Supreme Court of the United States has held otherwise. From the opinion in Winters v. People of State of New York, 333 U.S. 507, 68 S.Ct. 665, 667, 92 L.Ed. 840, I quote:
"The line between the informing and the entertaining is too elusive for the protection of that basic right [a free press]. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine. Though we can see nothing of any possible value to society in these magazines, they are as much entitled to the protection of free speech as the best of literature. Hannegan v. Esquire, 327 U.S. 146, 153, 158, 66 S.Ct. 456, 460, 462, 90 L.Ed. 586."
(2) Closely related to the foregoing is the argument that coverage of court proceedings going beyond the inaccurate word pictures painted with the pen of the court room press reporter, would be merely to satisfy "idle curiosity" for entertainment purposes. This contention overlooks the obvious fact that under our concept of government there is a constant regard for the necessity of educating and informing our people concerning the proper functioning of all three branchs of government. There is no field of governmental activity concerning which the people are as poorly informed as the field occupied by the judiciary.
It is highly inconsistent to complain of the ignorance and apathy of voters and then to "close the windows of information through which they might observe and learn." Generally only idle people, pursuing "idle curiosity" have time to visit court rooms in person. What harm could result from portraying by photo, film, radio and screen to the business, professional and rural leadership of a community, as well as to the average citizen regularly employed, the true picture of the administration of justice? Has anyone been heard to complain that the employment of photographs, radio and television upon the solemn occasion of the last Presidential Inauguration or the Coronation of Elizabeth II was to satisfy an "idle curiosity"? Do we hear complaints that the employment of these modern devices of thought transmission in the pulpits of our great churches destroys the dignity of the service; that they degrade the pulpit or create misconceptions in the mind of the public? The answers are obvious. That which is carried out with dignity will not become undignified because more people may be permitted to see and hear.
(3) It is contended, usually orally and in smothered words or whispers, that some trial judges, and lawyers "who are hungry for publicity, will conclude that they are actors, and by some psychological motivation `play to the galleries' and so conduct themselves as to satisfy their own vanity, or otherwise exploit themselves."
Any judge or lawyer who so demeans himself before a camera does not change his inherent characteristics for that particular occasion. A "show-off" or a "strutter" will be just that whether a camera is present or not. They are readily identified by *470 any person of ordinary intelligence and are ultimately adequately and justly disposed of by the people. If a larger segment of society is permitted to witness such offensive conduct the offender will be properly judged by the people sooner than might otherwise be possible. Actual experience, however, has led to the majority view that participants in legal proceedings are far more careful in their conduct and indulge in less bickering in those cases where cameras are permitted to operate under court supervision. Equipment employed in broadcasting, either by radio or television, is such that if any participant evidenced an intention to offend in this matter all the judge would have to do would be to press a button and the offensive conduct would be inaudible and invisible to any person except those in the court room. The capable trial judges of this state can keep full control of any such situation which might arise. It is perfectly obvious that the solution of the problem does not lie in arbitrarily forbidding the photographing or broadcasting of court proceedings. A constitutional right of all citizens cannot be denied because a very few persons may conceivably make fools of themselves before a larger audience than that which might otherwise be subjected to their offensive conduct. In the case of State v. Hensley, 75 Ohio St. 255, 79 N.E. 462, 463, 9 L.R.A., N.S., 277, the court said:
"The people have the right to know what is being done in their courts, and free observation and the utmost freedom of discussion of the proceedings of public tribunals that is consistent with truth and decency tends to the public welfare."
(4) Another argument frequently referred to during the hearings as supporting Canon 35 is that to permit photography at public trials would violate the "right of privacy" of participants or spectators. There are at least two conclusive answers to this contention:
First: One needs only to cite the law applicable to the question, which unequivocally and repeatedly has stated that when one becomes identified with an occurrence of public or general interest, he emerges from his seclusion and it is not an invasion of his "right of privacy" to publish his photograph or to otherwise give publicity to his connection with that event. The law does not recognize a right of privacy in connection with that which is inherently a public matter. Numerous cases are available on the subject and I have found no disagreement as to the law. Berg v. Minneapolis Star & Tribune Co., D.C., 79 F.Supp. 957; Metter v. Los Angeles Examiner, 35 Cal.App.2d 304, 95 P.2d 491; Jacova v. Southern Radio & Television Co., Fla., 83 So.2d 34; Jones v. Herald Post Co., 230 Ky. 227, 18 S.W.2d 972; Humiston v. Universal Film Mfg. Co., 189 App.Div. 467, 178 N.Y.S. 752; Smith v. Doss, 1948, 251 Ala. 250, 37 So.2d 118; Elmhurst v. Pearson, 80 U.S. App.D.C. 372, 153 F.2d 467; Gautier v. Pro-Football, Inc., 1952, 304 N.Y. 354, 107 N.E. 2d 485; Ettore v. Philco Television Broadcasting Corp., D.C.Pa.1954, 126 F.Supp. 143.
Second: To uphold Canon 35 on the ground that it prevents a violation of the individual's "right of privacy" would be to repudiate the provision of our constitution by rule of court, and to make effective the prior restraint upon freedom to publish, although the constitution expressly prohibits such restraints by clearly indicating that the remedy for abuse of the constitutional right to publish "whatever he will on any subject" is that the publisher shall be "responsible for all abuse of that liberty." How can it be contended that the prior restraint upon conduct imposed by the canon is valid when the constitution clearly indicates that the remedy for abuse of the "right of privacy" must be compensatory in its character?
(5) It also is argued that to permit photography or broadcasting of court scenes would mean that the trial judge would be confronted by innumerable persons clamoring for access to photograph and broadcast the proceedings, each attempting in a highly competitive business to outsmart his competitors. If such a threat were to become a reality there could be little hope of maintaining order and decorum in the judicial proceedings.
*471 The representatives of press and broadcasting interests have been alert to this situation and have taken effective steps to insure against any such debacle in this state. I can do no better than to quote from the testimony of Mr. Sheldon Peterson of the staff of K.L.Z. radio and television station:
"The Court is aware, of course, that the Denver area now has 14 radio stations and four television stations. * * *.
"The stations are throughly cognizant of this danger and, through a pooling arrangement, have taken positive steps to safeguard against it. To this end they have organized a permanent association. From the membership in this association, a standing committee has been named in which is fixed full responsibility for court room broadcasts and telecasts, should they be permitted. The committee consists of Mr. Joe Herold of Station KBTV; Mr. Grady Franklin Maples of Station KGMC; Mr. William Grant of Stations KOA Radio and TV; Mr. John Bosman of Station KIMN; and Sheldon Peterson of Stations KLZ Radio and TV. Mr. Herold and Mr. Maples are co-chairmen of the committee and Mr. Peterson is the secretary.
"Here is the way in which this Association proposes to function. Whenever any of the member stations wish to cover a given trial, they will communicate with the secretary who will carry the request to the judge. Should the judge decree that radio and television coverage shall be permitted, he need deal with only one individualthat is the secretaryin laying down the ground rules for such coverage. Having reached a clear understanding where the microphones and cameras shall be placed in the court room, the secretary shall then make the necessary arrangements for equipment and personnel. In all cases the Association pledges that it shall be a minimum amount of equipment. It is understood that the judge must be fully satisfied with the installation before the trial begins.
"From this basic equipment, duplicate tape recordings and film prints will be made available to all the Denver area radio and television stations that desire them. In this way, as many stations as wish may derive the benefits from the pool, yet there will be only one set of equipment for radio and one set for television. If the judge deems that live television of a trial shall be permitted, the same pooling arrangement shall prevail.
"The radio and television industries in the Denver area are highly competitive. The newsmen of these stations are fully as eager to exceed each other as are the newspaper photographers. Moreover, they are firmly convinced that under the freedoms guaranteed by the constitution, they have the right of access to the courts with microphone and camera.
"But they are mindful, too, that the decorum of the court room must be preserved at all costs. That is why they have decided to forego the possibility of gaining competitive advantage and have agreed to cooperate through this system of pooling. Having reached this agreement, the Denver area radio and television stations, through their Association, have every confidence that they can broadcast and telecast trial proceedings in a fashion thoroughly compatible with the traditional dignity of the courts."
A similar pooling arrangement has been entered into by representatives of the press photographers. This cooperative effort is to be commended; but even in the absence of these formal agreements the court in the exercise of its discretion could, and in cases of wide public interest unquestionably should, enforce similar regulations as a condition under which photographs or broadcasting of any kind would be permitted.
All of the above arguments, and others not specifically mentioned, are directed at preventing that which conjecture fears may produce an undesired result in matters wholly unrelated to the disposition of the *472 trial thus publicized, and have nothing whatever to do with the proper determination of the issues on trial.
I have given careful consideration to the language which should be employed in a new rule which would effectively do away with the discrimination against actual pictures in favor of word pictures, and at the same time afford positive protection against interference with orderly procedure and a fair public trial. In my judgment the entire matter should be left to the discretion of the trial judge. Limitations upon that power affixed by the Supreme Court rule would leave the impression that all matters within the field not covered by the express limitations were proper subjects of reproduction by photograph or radio. I know of no limitation which should be inflexibly applied to all cases because every case involves different personalities and circumstances, all of which should be considered by the trial judge before prescribing the conditions under which radio or photography might be had.
I recommend that the following rule be adopted, effective forthwith, which shall hereafter govern trial courts in matters pertinent thereto, and that it shall supersede any rule heretofore issued in conflict therewith.
"Proceedings in court should be conducted with fitting dignity and decorum.
"Until further order of this Court, if the trial judge in any court shall believe from the particular circumstances of a given case, or any portion thereof, that the taking of photographs in the court room, or the broadcasting by radio or television of court proceedings would detract from the dignity thereof, distract the witness in giving his testimony, degrade the court, or otherwise materially interfere with the achievement of a fair trial, it should not be permitted; provided, however, that no witness or juror in attendance under subpoena or order of the court shall be photographed or have his testimony broadcast over his expressed objection; and provided further that under no circumstances shall any court proceeding be photographed or broadcast by any person without first having obtained permission from the trial judge to do so, and then only under such regulations as shall be prescribed by him."
The broad discretion thus given the trial court affords ample protection against abuses of the constitutional right of freedom of the press, and will lead to a cooperative effort as between the judiciary and the press to protect, preserve, and portray the judicial process upon the level of justice to which it actually attains.
In connection with the canons other than the one dealing with court room photography and broadcasting, I have determined that no good purpose would be served in conducting further hearings on the question as to whether this court should amend or vacate the order entered on July 30, 1953, by which the canons of professional and judicial ethics were "adopted." I am sure that any possible controversy arising under these canons can be properly resolved by a clarification of the intent of the court in "adopting" the canons, and by a definite statement concerning their applicability to disciplinary proceedings instituted under the provisions of chapter 20, Rules of Civil Procedure Colo.
By the "adoption" or "approval" of the canons of ethics the court did not intend to give them the force or effect of law. "Adoption" of the canons of ethics by the court was not intended to enlarge, or narrow, the field of conduct within which disciplinary actions would be warranted. It was not the intention of the court in expressing approval of these ethical standards to give the broad statements therein contained the effect of a "rule of court" enforceable as such. It was the intention of the court to recommend the canons of ethics as a wholesome standard of conduct, as a statement of general principles best calculated to reflect credit upon the profession, to bestow dignity and poise upon the court, and repose confidence and faith in the people concerning the administration of justice. Rules for conduct suggested in those canons which do not recognize the *473 distinction between that which is inherently wrong and inherently right, or that which is basically immoral and basically moral, or that which is fundamentally dishonest and fundamentally honest, cannot subject any person to disciplinary action because of the existence of the canon unless he was subject to such discipline in the absence of the canon. Although the canons employing language of wide coverage cannot be given the effect of law, they nevertheless are recognized generally as a system of principles of exemplary conduct and good character.
No one could reasonably contend that for each deviation from the broad generalities expressed in the canons of ethics, which recently have been given strained construction or have been used for ulterior purposes, a person departing therefrom should be subjected to discipline or unwarranted publicity when his conduct involves no element of inherent wrong, immorality or dishonesty.
Our Court has held, with reference to the practice of medicine which is another of the first recognized "learned professions," that the legislature under guise of the exercise of the police power could not provide for revocation of a physician's license "`for a mere breach of ethics not involving moral turpitude or dishonorable conduct.'" Lipset v. Davis, 119 Colo. 335, 203 P.2d 730, 732. Likewise we consider that this Court is without power to discipline attorneys for reasons other than those involving conduct which is inherently wrong, immoral or dishonest.
I am confident that our intention at the time of the "adoption" of the canons was, and now is, to approve them as a statement of high standards of conduct recommended to the bar and the bench as being best calculated, if substantially adhered to, to command and hold respect for the judicial processes of the land.
As limited by the foregoing, I see no valid reason why our former approval of the canons should be vacated or withdrawn.
Respectfully submitted this 20th day of February, 1956.
PER CURIAM.
On this 27th day of February, 1956, the Court, sitting en banc, approves and adopts the report of the referee and directs its publication in the official reports of this Court.