BARBARA JEANE NORMAN ET AL., APPELLANTS, *v.*
CITY OF LAS VEGAS, NEVADA, A MUNICIPAL
CORPORATION ET AL., RESPONDENTS.

No. 3470

February 7, 1947.                                    177 P. 2d 442.

See, also, 63 Nev. 473, 175 P.2d 429.

*Morse & Graves,* of Las Vegas, for Appellants.

*C. Norman Cornwall,* of Las Vegas, for Respondents.

## OPINION

By the Court, BADT, District Judge:

Do the provisions of sections 3, 4, and 5 of ordinance No. 305 of the city of Las Vegas, requiring the finger

printing and photographing of all persons seeking employment in establishments selling alcolohic beverages at retail for consumption on the premises (excepting the employees of cafes and restaurants) and requiring the imprints to be forwarded to the California and Federal bureaus of identification, and requiring that the chief of police of Las Vegas be notified of the returns thereon, and making it unlawful for the owners of establishments to employ such persons without such registration, violate the privileges and immunities clause of the United States constitution, art. 4, section 2, or Nevada's constitutional guarantees of life, liberty and the pursuit of happiness, art. 1, sec. 1?

The trial court answered this question in the negative and sustained a general demurrer to the complaint (which sought a declaratory judgment, declaring the sections void and enjoining their enforcement) and vacated the temporary restraining order that had been issued ex parte restraining the enforcement of the ordinance. The plaintiffs declined to plead over and appealed from the order. No final judgment was entered, but both parties have treated the order as a final disposition of the case in the district court. The applicable parts of the ordinance, generally and loosely described above, are as follows:

Section 1, subdivision B: " 'Employees of Establishments where Alcoholic Beverages are sold at Retail on the Premises' shall mean bartenders, waiters and any other person who serves alcoholic beverages to patrons for consumption on the premises, save and excepting the employees of cafes and restaurants."

Section 2: "It is hereby declared to be the policy of the City of Las Vegas, as herein expressed by the Board of Commissioners of the City of Las Vegas, that the safety, morals, good order and general welfare of the inhabitants of the City of Las Vegas will be better protected and served, by requiring the registration with the Police Department of said City, and the thumb, finger-printing, and photographing of all employees of

gambling houses, taxi drivers, and employees of establishments where alcoholic beverages are sold at retail and served on the premises, as such employees and establishments are defined in Section 1 of this Ordinance."

Section 3 of said ordinance provides as follows: "It shall be unlawful for any person to accept employment in any gambling house, as a driver or operator of any taxicab, or in any establishment where alcoholic beverages, as defined in Section 1 hereof, are sold at retail and consumed on the premises, unless such person shall first have registered his name and address with the Police Department of the City of Las Vegas and shall have had his thumb, fingerprints, and photograph taken and filed with the Bureau of Identification of the City of Las Vegas."

Section 4 of said ordinance provides as follows: "Upon such employee complying with the provisions of Section 3 hereof, the Chief of Police shall issue a certificate to such employee showing compliance therewith, and the Bureau of Identification shall forthwith send a copy of such imprints to the Bureau of Identification of the State of California, and one copy to the Identification Bureau of the Federal Bureau of Investigation at Washington, D. C., with the request that all information as to the previous record, if any, of such person, be forthwith transmitted to the Bureau of Identification at Las Vegas, Nevada. Upon receipt of such information the Bureau of Identification at Las Vegas shall forthwith notify the Chief of Police. The information, if any, received as aforesaid shall be treated as confidential and shall only be made accessible to the Mayor and Board of Commissioners of the City of Las Vegas, the employer of such person, and to law enforcement officer."

Section 5 of said ordinance provides as follows: "It shall be unlawful for any person, firm or corporation operating a gambling game, taxicab or taxicabs, or an establishment where alcoholic beverages are sold at retail for consumption on the premises, to employ any person required to register with the Police Department

by the terms of this Ordinance, unless such person shall have so registered with the Police Department of the City of Las Vegas and had his thumb, fingerprints and photograph taken and filed with the Bureau of Identification of the City of Las Vegas."

Several preliminary matters require attention. Plaintiff Norman is a waitress employed in an establishment at Las Vegas where alcoholic beverages are served to patrons at retail for consumption on the premises, and in the course of her employment she serves alcoholic beverages to patrons for consumption on the premises. Plaintiff McGovern is likewise an employee of an establishment at Las Vegas where alcoholic beverages are sold at retail on the premises, and his employment consists of dispensing alcoholic beverages at retail on the premises to patrons of his employer for consumption on the premises. These two plaintiffs allege that they bring this action on their own behalf and on behalf of all persons similarly situated. Plaintiff Bartenders Union, Local 165, is an organization consisting of bartenders, some of whom are employees of establishments in the City of Las Vegas where alcoholic beverages are sold at retail on the premises to patrons for consumption on the premises. Plaintiff Culinary Workers Union, Local 226, is an organization in the City of Las Vegas whose members comprise waiters and waitresses, some of whom are duly and regularly employed at Las Vegas in establishments where alcoholic beverages are sold at retail on the premises to patrons for consumption. Both plaintiff unions allege that they join as plaintiffs on their own behalf and also in a representative capacity on behalf of all of their members so employed.

Respondent contends (1) that neither of the plaintiff associations or organizations has such existence in law as to be capable of maintaining an action in its own name; (2) that neither is a real party in interest; (3) that neither is a citizen of the United States and therefore not entitled to the privileges and immunities guaranteed by the constitution of the United States;

(4) that this is not a true class suit and that the two individual personal plaintiffs may not sue on behalf of all persons similarly situated. By reason of the views hereinafter expressed it becomes unnecessary to pass upon these points.

■ Appellants go to some length in attacking the validity of the ordinance as applied to taxi drivers and gambling house employees. Respondent also has devoted a material part of its brief to an exposition of the reasonableness of the classification of taxi drivers and gambling house employees as subject to the requirements of the ordinance. The learned district judge, in dealing with this phase of the case, said: "The plaintiffs, being associated in one form or another only with the business of dealing in liquor, as appears from the complaint, cannot legally complain of the ordinance insofar as it provides regulatory measures for taxi drivers and for employees of gambling houses. Adams v. American Agricultural Chemical Co., 78 Fla. 362, 82 So. 850; Murphy v. People of California, 225 U.S. 623, 32 S.Ct. 697, 56 L.Ed. 1229, 41 L.R.A.,N.S., 153. In other words, the validity of the ordinance with respect to taxi drivers and gambling house employees is not involved in this action."

We are in entire accord with this view. Although appellants complain that there is an unreasonable discrimination between taxi drivers, on the one hand, and chauffeurs, bus drivers, station wagon drivers, truck drivers, etc., on the other, none of the plaintiffs in this case would be affected by such alleged unreasonable discrimination, would not suffer thereby, and "is not in position to complain." Murphy v. People of California, supra [225 U.S. 623, 32 S.Ct. 699].

■ It is further maintained that the board of city commissioners of the city of Las Vegas, was without statutory authority to adopt the ordinance in question. We consider the authority ample. N.C.L.1931–41 Sup. sec. 3681, 3690, 3691, 3690.17. Las Vegas Charter, Laws 1911, c. 132, sec. 31, subds. 10, 81, as amended,

Stats.Nev.1939, chap. 155, sec. 10; State ex rel. Grimes v. Board of Commissioners, 53 Nev. 364, 1 P.2d 570.

We are confronted then with the question presented at the beginning of this opinion, namely, whether the sections in question are valid and are not in violation of the constitutional rights asserted, so far as these sections apply to persons accepting employment in an establishment where alcoholic beverages are sold at retail and consumed on the premises. Although the parties stipulated to submit their appeals without oral argument, the opening and reply briefs of the appellants insist that no case has been cited to the court in which an ordinance or statute goes as far as Las Vegas ordinance No. 305; that the ordinance deprives the personal plaintiffs of their right to work; and that it invades their right of privacy, which they maintain to be "fundamental." In view of the authorities upon which the appellants rely, attention should be called at the outset to the fact that the Las Vegas ordinance does not require or contemplate that the photographs of the bartenders, etc., should be forwarded for "posting" or "publication" or display in "rogues' galleries." It is only "the imprints" (which we take to mean the thumb and fingerprints mentioned in the ordinance) that are required to be forwarded to the federal and California bureaus of Investigation. The question is further narrowed by the fact that the appellants frankly concede that the part of the ordinance requiring the thumbprinting and fingerprinting and photographing and the registration thereof with the Las Vegas bureau of identification is not objectionable. It is the "dissemination" of the prints and the "dissemination" of the facts of the employee's previous criminal record, if such be the case, that is claimed to violate their right of privacy which is asserted to be guaranteed by both the federal and state constitutions.

Appellants suggest that the subject of the right of privacy in our jurisprudence is comparatively new and the authorities not numerous. As late as May of last year the supreme court of Indiana (infra), confronted

with a similar problem, found it necessary to decide "this interesting question." Appellants frankly place their reliance upon the case of McGovern v. Van Riper, 137 N.J.Eq. 24, 43 A.2d 514; Id., 137 N.J.Eq. 548, 45 A.2d 842, decided in July, 1945. In that case McGovern, sheriff of Hudson County, New Jersey, was indicted for failure (contrary to the statute) to cause certain persons to be fingerprinted and photographed after they had pleaded to an indictment against them. He sued to enjoin the defendants from taking his fingerprints and photograph and forwarding them to the superintendent of state police, to the rogues' galleries in other states, to the F.B.I., to Scotland Yard, England, and to the police departments of other countries, all in advance of conviction, contending that such distribution in advance of conviction would violate his right of privacy, which right was claimed to be protected by the constitution of New Jersey, as well as the constitution of the United States. The defendants were temporarily restrained, ex parte, from taking and forwarding his fingerprints and photograph, etc., but the court of chancery, on return of an order to show cause why the temporary restraint should not be continued pending final hearing, lifted the restraint against the taking of his fingerprints and photograph or other identification data, but continued the restraint against "forwarding, disseminating or publishing the same in advance of conviction unless the complainant shall become a fugitive from justice." McGovern appealed to the court of errors and appeals of New Jersey from the part of the order dissolving the restraint against the taking of the finger prints and photograph. The propriety of the restraint against the "dissemination" was not involved in the appeal. The appellate court affirmed the order lifting the restraint against the taking of the fingerprints and photographs. McGovern v. Van Riper, 137 N.J.Eq. 548, 45 A.2d 842.

In his opinion, the learned vice chancellor collected the authorities dealing with the origin and development of the right of privacy and likewise the right to protect

such privacy by injunction. That such right exists, independently of its connection with any property right now seems to have received the virtually unanimous recognition of courts and text writers, while earlier cases rejecting such right have been disapproved. The present concern of the court, however, is not with the question as to whether such right exists (indeed the respondent does not seriously contend that it does not) nor whether such right can be protected by injunction, but whether under the facts alleged the ordinance in question violates the right of privacy of the complainants, or at least of the two personal complainants (appellants herein). The vice chancellor, after his collection of the authorities developing the rule of the right of privacy, comes to the following conclusion [137 N.J.Eq. 24, 43 A.2d 519]: "It is now well settled that the right of privacy having its origin in natural law, is immutable and absolute, and transcends the power of any authority to change or abolish it."

This conclusion has never received the approval of the court of last resort of the State of New Jersey, has been severely criticized by at least one other court, and is in our opinion not a logical conclusion from the authorities cited or from the history of the development of the law of privacy as traced by the vice chancellor and as characterized by other courts and text writers.

In the case of the State ex rel. Mavity v. Tyndall, Ind.Sup., 66 N.E.2d 755, 758, the supreme court of Indiana had this to say with reference to McGovern v. Van Riper, supra:

"In this opinion the Vice Chancellor, aware of the fact that in New York the common law right of privacy is not recognized, nevertheless, relies on numerous New York cases to reach his conclusion. We do not regard them as applicable since in that jurisdiction legislation is the source of the right and remedy. Upon the absence of legislation is based the case of Matter of Molineux v. Collins, 1904, 177 N.Y. 395, 69 N.E. 727, 65 L.R.A. 104,

cited by appellees. In that case photographs and Bertillon measurements were described as public records taken pursuant to a mandatory statute and as such records not subject to surrender or destruction without a similar mandate. Where, as in the present case, fingerprints and photographs are made in the exercise of an executive discretion and not pursuant to legislative order it would seem that the authority to take would imply the authority to surrender or destroy.

"Turning again to the opinion of Vice Chancellor Kays it is apparent that the only way by which he could escape the legislative mandate for immediate forwarding of identification data was to declare the statute unconstitutional. To reach this conclusion he was required to put the right of privacy beyond the control of the legislature. He said (137 N.J.Eq. 24, 43 A.2d 519) :

" 'It is now well settled that the right of privacy having its origin in natural law, is immutable and absolute, and transcends the power of any authority to change or abolish it.'

"This view is not shared by other writers on the subject and seems to us unsound."

Nor does the conclusion of Vice Chancellor Kays that "the right of privacy having its origin in natural law is immutable and absolute and transcends the power of any authority to change or abolish it," find support in the "classic article" by Samuel Warren and Louis B. Brandeis entitled "The Right of Privacy," 4 Harvard Law Rev. 193, (1890). This article (although Cooley, Torts, 2d Ed. 29, had referred to every man's right "to be let alone") has often been referred to as the origin of the doctrine, but even there we find a distinct recognition of the fact that this "right" cannot prevail when it comes into conflict with the public interest. Id. 214 et seq. And particularly do the learned authors admit that the right of privacy would not "prohibit any publication made by one in the discharge of some public or private duty, whether legal or moral. * * *" Id. 217; nor

could they reasonably have called the ordinance in question one that "opened wide the back door to idle or prurient curiosity."

The main authority upon which the learned vice chancellor relied was Pavesich v. New England Life Ins. Co., 1905, 122 Ga. 190, 50 S.E. 68–81, 69 L.R.A. 101, 106 Am.St.Rep. 104, 2 Ann.Cas. 561, in which Cobb, J., for the Georgia supreme court, wrote a most scholarly opinion tracing the origin and growth of the right of privacy. The case falls far short, however, of justifying the conclusion that such right is beyond the power of the legislature to abridge, and abounds in clauses (unnecessary to quote here) recognizing the fact that it must in many instances give way to the rights of the public. And in the exhaustive and analytical annotation in 138 A.L.R. 22 by R. T. Kimbrough (1942), in which all of the cases up to that time are gathered, it is stated: "In every case involving an assertation of a right of privacy, the court is called upon to resolve a conflict between the rights of the individual on the one hand and the interests of society on the other." Id. 45. Nor does the vice chancellor's conclusion that the right of privacy transcends the power of any authority to change it because it has "its origin in natural law," find logical support. It is unnecessary to enter into the lively debate now going on between Mr. Ben W. Palmer and Mr. Charles W. Briggs, espousing natural law on the one hand and positive law on the other,[1] but it might be well to note the comment of Mr. Palmer, exponent of natural law. "Natural law is the participation in the eternal law of an ordered universe by man as a rational creature. Participation in that order demands that man's conduct should be in harmony with his nature as part of that order, in furtherance of his 'being.' "

So it is said that, even under natural law, he may not destroy life, or the liberty that makes life enriching to

[1]"Hobbes, Holmes and Hitler," 31 A.B.A.J. 569, "Defense against Leviathan," 32 A.B.A.J. 328, "Justice Holmes was Not on a Ladder to Hitler," Id. 631, "Reply to Mr. Briggs," Id. 635.

others, or the family, or the property of another. Blackstone, under the heading of "Natural Liberty," puts it: "The absolute rights of man, considered as a free agent, are denominated the natural liberty of mankind, which consists in a power of acting as one thinks fit, without any restraint or control, unless by the law of nature; being a right inherent in us by birth, when God endowed man with free will. But every man, when he enters into society, gives up a part of his natural liberty as the price of so valuable a boon, and obliges himself to conform to those laws, which the community has thought proper to establish. Otherwise, there would be no security to individuals in any of the enjoyments of life." 1 Blackstone's Commentaries 125–6.

So the restrictions and restraints, even the affirmative duties, with which every "free man" in America's social and economic complexity of today is burdened, though passed by legislative bodies and printed, bound and codified, are but the outgrowth of the restrictions of the natural law, which existed before man put a mark on bark or stone. Each normal day sees a multitude of them. Mr. Smith leaves his home in the morning—the home that he could not build without a building permit, set so far back from the street, with flues and wiring and plumbing that he was compelled to install, through his door over which he was compelled to place a number, over a sidewalk he had to construct, into a car that he must park at a certain angle to the curb and that cannot be operated without a license plate and which he may not drive without a driver's license, to a street intersection that he may not cross till the light shines green. He may be served with a subpoena that compels him to lay all personal and business matters aside and attend at once as a trial juror or a witness. When he arrives at his office or place of business the restrictions and requirements enjoined upon him by the state are multiplied a hundred fold. He may not negotiate freely concerning his rentals, he must provide certain working conditions for his employees and must pay them not less

than a certain wage and not work them longer than a given number of hours per day or per week. Many apparently innocent and normal business transactions are forbidden to him, and the profits of others would be almost entirely absorbed in taxes. Whichever way he turns there stands at his elbow a representative of some branch of government, and possibly half of his working day is consumed in making sundry reports to the state. But entering society, he has given up that part of his "natural liberty" which these duties restrict, "as the price of so valuable a boon," because "where there is no law, there is no freedom" and because salus populi est suprema lex. So the immutability and absoluteness of the right of privacy, the right to be let alone, finds little support in the mere fact that it had its origin in natural law.

■ Although appellants insist that the rule set down in the Van Riper case "is a rule of reason and should be followed" they give implied acceptance to the necessary qualification of this rule by specifically approving respondent's contention that "the right to the civil liberties guaranteed by the Fourteenth Amendment to the constitution of the United States is qualified and not absolute. It is subject to legislative restraint and regulation reasonably imposed in the exercise of police powers." This conclusion is indeed well supported by the authorities. Mickey v. Kansas City, Mo., D.C., 43 F. Supp. 739, 742;[2] Hamilton v. City of Montrose, 109 Colo. 228, 124 P.2d 757, 759;[3] West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R.

[2] The "Jehovah's Witness Case," in which the Court, quoting the U. S. Supreme Court, said: "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses."

[3] The use of a "loudspeaker" at an out door religious meeting was the cause of an arrest for violation of a city ordinance prohibiting the use of any bell, horn, bugle or other sounding instrument or any loud or offensive device to attract any crowd or so as to disturb or annoy any person. "Here then is another case involving a conflict between liberty and authority, a conflict that is sometimes labeled 'civil rights v. the police powers' or 'liberty of the individual

1330;[4] Hardware Dealers Mutual Fire Insurance Co. v. Glidden Co., 284 U.S. 151, 52 S.Ct. 69, 76 L.Ed. 214;[5] Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 361, 49 L.Ed. 643, 3 Ann.Cas. 765;[6] Morris v. Holshouser, 220 N.C. 293, 17 S.E.2d 115, 137 A.L.R. 733; Kingston Trap Rock Co. v. International Union, etc., 129 N.J.Eq. 570, 19 A.2d 661; State ex rel. Grimes v. Board of Commissioners, 53 Nev. 364, 1 P.2d 570, 572.[7]

■■ Appellants further urge that even though the right of privacy may be subject to some limitations or restrictions in the exercise of the reserved police powers of the state, when such right runs counter to the interests of the public, the personal plaintiffs are deprived of their privileges and immunities and their equal protection of the law because (1) their occupation of serving

v: the general welfare.' * * * The (14th) Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute, but, in the nature of things, the second cannot be."

[4]"But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people." Id., 300 U.S. 379, 57 S.Ct. 581, 81 L.Ed. 708, 108 A.L.R. 1330.

[5]"Liberty implies only freedom from arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community." Id., 284 U.S. 151, 52 S.Ct. 70, 76 L.Ed. 218.

[6]But "the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restrain. There are manifold restrains to which every person is necessarily subject for common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others."

[7]"We think the distinction drawn between a business of the latter character (dealing in intoxicating liquor) and useful trades, occupations, or businesses is substantial and necessary for the proper exercise of the police power of the state. Gaming as a calling or business is in the same class as the selling of intoxicating liquors in respect to deleterious tendency. The state may regulate or suppress it without interfering with any of those inherent rights of citizenship which it is the object of government to protect and secure."

drinks is a lawful one and they are unreasonably singled out by the ordinance, (2) the exemption by the ordinance of those who serve food with drinks is unreasonable, (3) the ordinance, if purporting to be one to regulate the liquor business, is directed not to the regulation or control of such business, but to the plaintiffs as employees, (4) the respondent is called upon to allege, and in due course to prove, that the ordinance is factually and statistically warranted, and (5) "disseminating" the facts of a prior criminal record is not a justifiable or reasonable exercise of the police power after a man has expiated his crime and seeks to resume an honored place in society by practicing his lawful occupation of tending bar. We might dispose of the last ground by noting that none of the plaintiffs has placed himself in the position of a person with a criminal record, any more than he has placed himself in the position of a taxi driver or employee of a gambling establishment, and so is not in position to complain of the ordinance on this ground. The other grounds urged involve matters largely within the discretion of the governing board of the city of Las Vegas. We are not called upon to determine the wisdom of the ordinance, nor may we interfere with the discretion of the board unless it has been exercised arbitrarily or through mere whim or caprice or is grossly unjust or oppressive. See State ex rel. Grimes v. Board of Commissioners, 53 Nev. 364, 1 P.2d 570 and cases therein cited. In Giozza v. Tiernan, 148 U.S. 657, 13 S.Ct. 721, 723, 37 L.Ed. 599, the court said: "The privileges and immunities of citizens of the United States are privileges and immunities arising out of the nature and essential character of the national government, and granted or secured by the constitution of the United States, and the right to sell intoxicating liquors is not one of the rights growing out of such citizenship."

The reasoning of the foregoing cases applies with as great force to a bartender employee as it does to the owner of the establishment. After placing the business

of gambling "in the same class as the selling of intoxi-
cating liquors in respect to deleterious tendency," this
court said in State ex rel. Grimes v. Board of Commis-
sioners, supra, that the power granted by the ordinance
even to restrict the number of licenses was "a very neces-
sary implication from the power to license and regulate
*  *  *" and necessarily incidental to such power, and
that on account of the nature of the business "a very
wide discretion is thus conferred  *  *  *  to pass all
reasonable rules and regulations concerning it which the
city authorities may deem necessary for the police gov-
ernment of the municipality." Citing with approval
Crowley v. Christensen, 137 U.S. 86–91, 11 S.Ct. 13, 34
L.Ed. 620, this court further said: "The manner and
extent of regulation rest in the discretion of the govern-
ing authority." Appellants urge with great earnestness
that the factual or statistical basis for the exercise of
such discretion must affirmatively appear, and that the
ordinance cannot be sustained in the absence of proof
tending to establish its need. No authorities are cited
in support of such contention and we are not impressed
with its logic. Indeed the presumption and the burden
are quite the other way. Pacific States Box & Basket
Co. v. White, 296 U. S. 176, 56 S.Ct. 159, 80 L.Ed. 138;
101 A.L.R. 853. Section 2 of the ordinance is in effect a
finding that "the safety, morals, good order and general
welfare" of the inhabitants of the city "will be better
protected and served" by the enforcement of its pro-
visions. "The provisions of the charter vest in the com-
mon council authority to regulate and control the sale
of intoxicating liquors within the city, and, in exercising
that authority, the council is clothed with discretionary
powers, the exercise of which cannot be controlled by
the courts." State ex rel. Grimes v. Board of Commis-
sioners, supra, citing with approval State ex rel. Howie
v. Northfield, 94 Minn. 81, 101 N.W. 1063.

The foregoing also disposes of appellants' conten-
tion that the ordinance does not purport to regulate the
sale of intoxicating liquors but only the individual rights

of the plaintiffs to accept employment in such establishments. The board evidently concluded that the provisions of the ordinance constituted a reasonable method of regulating and controlling the industry and preventing abuses. The same also applies to the contention that the exemption of those who serve food with drinks is unreasonable. The full course dinner of today may start with a cocktail, include a white wine with the fish, a red wine with the roast and a liqueur or a cafe royal with a final bit of Cammenbert. There may be champagne, and the pudding may be served with a flaming rum sauce. Or a seafood supper may be served with accompanying steins of pilsener or bock or ale. Although many will disapprove such practices the city fathers of Las Vegas apparently did not find them so objectionable as to bring them within the purview of the ordinance. That this exemption might permit some evasion through the serving of "rubber sandwiches" with drinks, would hardly justify us in holding the exemption to be so unreasonable that the entire ordinance should be struck down. We do not consider the classification arbitrary, unreasonable, whimsical or capricious, and it is our duty to sustain the classification if there is any reasonable basis for it. Hines v. Hook, 338 Mo. 114, 89 S.W.2d 52, and cases therein cited. State ex rel Lawson v. Woodruff, 134 Fla. 437, 184 So.81. See also City of Wichita v. Wolkow, 110 Kan. 127, 202 P. 632.

■ One error into which we think appellants have fallen is their construction and interpretation of section 4 of the ordinance, which appellants conceive to require the "dissemination" of the employee's former criminal record if disclosed by the data received by the Las Vegas police department. The section requires the bureau of identification of Las Vegas to send the finger prints to the bureau of investigation of the State of California and the federal bureau of investigation with request for information of any previous record. "The information, if any, received as aforesaid shall be treated as confidential and shall only be made accessible to the mayor

and board of commissioners of the city of Las Vegas, the employer of such person and (the) law enforcement officer." This creates a far different picture from that of "disseminating" the information. "Disseminate" may be said to be one of the many picturesque words of our language. Derived from the Latin semen, a seed, it is defined by Webster as "to sow broadcast or as seed," and, carrying the metaphor farther, "as principles and ideas are disseminated when they are spread abroad by propagation." The word creates the same picture as "broadcast," which Webster defines as "to disseminate widely," and whose present popular meaning is identified with radio, which disseminates information to the four corners of the earth. While the restriction upon the furnishing of the information gained may not perfectly accomplish the announced requirement that "the information * * * shall be treated as confidential," such restrictions would appear greatly to ameliorate the harshness which appellants fear would attend the "dissemination" of the information. This situation seems to have been in the mind of the court in State ex rel. Mavity v. Tyndall, supra [66 N.E.2d 762], when it said: "In practically all the cases we find this emphasis upon 'posting,' 'publication,' 'exhibition,' in a public place called the 'rogues' gallery.' Without such a public display or manifest purpose to place an innocent complainant's photograph in juxtaposition with those of hardened criminals, we wonder if the courts would have felt justified in interfering by injunction."

This element characterized the cases of State ex rel. Reed v. Harris, 348 Mo. 426, 153 S.W.2d 834; Schulman v. Whitaker, 117 La. 704, 42 So. 277, 7 L.R.A.,N.S., 274, 8 Ann.Cas. 1174 and Itskovitch v. Whitaker, 117 La. 708, 42 So. 228, 116 Am.St. Rep. 215, all of which are relied on by appellants. The situation that the court found objectionable in those cases does not exist under the Las Vegas ordinance. In State ex rel. Reed v. Harris, supra (in which prohibition was sought against the assuming of jurisdiction by the lower court of a suit to enjoin the

officers from forwarding photographs, etc. for exhibition) the court, in denying the writ, emphasized the fact that there was no express legislative authority for the threatened circulation of the photographs, except in the case of persons convicted of a felony.

In Jenkins v. McGovern, 136 N.J.Eq. 563, 43 A.2d 526, a companion case to McGovern v. Van Riper, supra, the same learned vice chancellor had denied an application of the attorney general of the state for leave to intervene and be made a party defendant. (The action was one for an injunction to restrain the sheriff from taking and forwarding the complainant's fingerprints, etc., under the same act under attack in McGovern v. Van Riper). The court of errors and appeals of New Jersey, by a unanimous court, nine justices and five judges, reversed this order, and held that the attorney general was properly in court to represent the state. We mention this situation simply to indicate the danger of relying upon the authority of an intermediate court as precedent, as we here find the same learned vice chancellor, in a companion case, but involving a different point, unanimously reversed by an appellate court of 14 judges.

We have given the McGovern case so much attention because of the evident care with which the opinion was written, and because, in the last analysis, the appellants are forced to a complete reliance thereon, but whose conclusions we must reject both on reason and authority. The order of the district court vacating the temporary restraining order and sustaining the general demurrer to the complaint (which, under the record as it comes to us with the approval of the parties, we must interpret as a judgment for the defendant) is hereby affirmed with costs.

The order made by this court on September 5, 1946, staying proceedings in the lower court until the further order of this court (and which order this court on December 30, 1946, refused to vacate, 63 Nev. 473, 175 P.2d 429) is hereby vacated and set aside.

EATHER, C. J., concurs.

TABER, J., participated in the consideration of this matter, but died on February 6, 1947, the day before the opinion was ready for his signature.

HORSEY, J., being disqualified, the Governor designated HON. MILTON B. BADT, Judge of the Fourth Judicial District, to sit in his stead.