332 P.2d 447]

## Appellate Department, Superior Court, Los Angeles

[Crim. A. No. 3865. Nov. 17, 1958.]

THE PEOPLE, Respondent, v. MANUEL D. TALLEY, Appellant.

798

Simmons & Simmons for Appellant.

A. L. Wirin, Fred Okrand and Mandle Rottman, as Amici Curiae on behalf of Appellant.

Roger Arnebergh, City Attorney (Los Angeles), Philip E. Grey, Assistant City Attorney, and William E. Doran, Deputy City Attorney, for Respondent.

DAVID, J.—Defendant was convicted of a misdemeanor, having violated the provisions of Los Angeles Municipal Ordinance Number 77,000, section 28.06, in that he distributed a handbill which did not then and there have upon it the name and address of the person who printed, wrote, compiled or manufactured it, nor the same information as to the person who caused the same to be distributed, nor the true names and addresses of the owners, managers or agents of the fictitious person and club who sponsored the handbill. Defendant appeals from conviction on the ground that the ordinance violates United States Constitution, Amendments 14 and 1.

The appellant concedes that the decision in *People* v. *Arnold* (1954), 127 Cal.App.2d Supp. 844 [273 P.2d 711], disposes of his contentions adversely but asks reconsideration and reversal of the view there taken submitting substantially the same brief that was then submitted to this court. We adhere to the decision in the case of *People* v. *Arnold,* and the conviction of appellant must be affirmed.

The essence of the right of "free speech" is derived

from the historical connotation of the phrase, not from giving uncontrolled effect to the adjective "free." It means essentially "freedom from censorship" or "prior restraints" which prevent free discussion (*Joseph Burstyn, Inc.* v. *Wilson* (1951), 343 U.S. 495, 503 [72 S.Ct. 777, 96 L.Ed. 1098]; *People* ex rel. *Barton* v. *American Auto Ins. Co.* (1955), 132 Cal.App.2d 317, 326 [282 P.2d 559]), and such "free discussion" historically had to do with political questions, or governmental action. *United States* v. *Dennis* (2 Cir., 1950), 183 F. 2d 201, affirmed *Dennis* v. *United States* (1950), 341 U.S. 494 [71 S.Ct. 857, 95 L.Ed. 1137]. It has never meant that a speaker was free from accountability for what is written or printed, except as otherwise provided by law, such as in the privilege afforded legislative or judicial proceedings.

 The present ordinance places no restriction upon what can be said, who can say it, or where it can be said, or when it can be said. The requirement that the desired information be placed upon a handbill, does not serve in any way to restrict what may be said, except the purely speculative personal possibility that someone might hesitate to identify himself with his own statements therein contained.

It therefore would seem that the requirement is reasonably germane to the exercise of the police power since it provides a means of determining and securing responsibility for what is said, for as stated in California Constitution, article I, section 9 (and in the constitutions of 43 other states) the right of "free speech" is accompanied by correlative responsibility for its abuse. It will not do to say that the right is abridged because the law provides a means to fix responsibility for abuses.

 The authority of legislatures to impose such regulations has not been regarded to be inconsistent with civil liberties, but essential to their preservation. Where the restriction promotes the welfare and good order of all the citizens of the state, it cannot be disregarded by the attempted exercise of some civil right for which protection is claimed. *Cf.* C. J. Hughes in *Cox* v. *State of New Hampshire* (1940), 312 U.S. 569, 574 [61 S.Ct. 762, 765, 85 L.Ed. 1049]. Precensorship of what is said would be unconstitutional. It is equally clear that a state may by general and nondiscriminatory legislation regulate the times, places and *manner* of speech upon a street; which would include the distribution of written speech; and may in other respects safeguard the peace, good order, and comfort of the community, without thereby invading the

liberties protected by the 14th Amendment. *Cantwell* v. *State of Connecticut* (1939), 310 U.S. 296, 303-304 [60 S.Ct. 900, 903, 84 L.Ed. 1213, 1214], by a unanimous court.

In *Corporation of Presiding Bishop of Church of Jesus Christ* v. *City of Porterville* (1949), 90 Cal.App.2d 656 [203 P.2d 823], appeal dismissed 338 U.S. 805 [70 S.Ct. 78, 94 L. Ed. 487], rehearing denied 338 U.S. 939 [70 S.Ct. 342, 94 L.Ed. 579], it was asserted that the ordinance of the city of Porterville restricting churches to zones other than the first residential zone was a law prohibiting the free exercise of religion, in violation of the 1st Amendment, as embraced in the 14th. In *American Communications Ass'n, C.I.O.* v. *Douds* (1949), 339 U.S. 382, 397-398 [70 S.Ct. 674, 683, 94 L.Ed. 925], Chief Justice Vinson referred to the court's action in the Porterville case, as an instance in which there was no unlawful restriction, ''When the effect of a statute or ordinance upon the exercise of First Amendment freedoms is relatively small and the public interest to be protected is substantial. . . .'' As said by Mr. Justice Reed in *Jones* v. *City of Opelika* (1941), 316 U.S. 584, 593-594 [62 S.Ct. 1231, 1237, 1238, 86 L.Ed. 1691], ''One man, with views contrary to the rest of his compatriots, is entitled to the privilege of expressing his ideas by speech or broadside to anyone willing to listen or to read. . . . But that hearing may be limited by action of the proper legislative body to times, places and methods for the enlightenment of the community which, in view of existing social and economic conditions, are not at odds with the preservation of peace and good order.''

It is said, ''whenever state action is challenged as a denial of 'liberty,' the question always is whether the state has violated 'the essential attributes of that liberty.' . . . While the right of free speech is embodied in the liberty safeguarded by the Due Process Clause that Clause postulates the authority of the states to translate into law local policies 'to promote the health, safety, morals, and general welfare of its people. . . . The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise.' . . . 'The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side.' . . .'' Mr. Justice Frankfurter in *Carpenters & Joiners Union of America, Local No. 213* v.

*Ritter's Café* (1941), 315 U.S. 722, 726 [62 S.Ct. 807, 809, 86 L.Ed. 1143], quoting from *Near* v. *State of Minnesota* (1930), 283 U.S. 697, 707, 708 [51 S.Ct. 625, 628, 75 L.Ed. 1357].

The "points along the way" include *Schneider* v. *State of New Jersey, Town of Irvington (Kim Young* v. *People of State of California)* (1939), 308 U.S. 147, 154-155, 158, 159, 162 [60 S.Ct. 146, 148, 149, 151, 84 L.Ed. 155, 160-161, 163, 165], the statement relative to municipal power; *Niemotko* v. *State of Maryland* (1950), 340 U.S. 268, 273 et seq. [71 S.Ct. 325, 328, 95 L.Ed. 267], Mr. Justice Frankfurter's concurring opinion; *Dennis* v. *United States, supra,* 341 U.S. 494 [71 S.Ct. 857, 95 L.Ed. 1137, 1160-1194], and *Thomas* v. *Collins* (1944), 323 U.S. 516 [65 S.Ct. 315, 89 L.Ed. 430], which is nearest to the question at bar. The analysis made in the minority opinion in *Thomas* v. *Collins* of the nature of preregistration is akin to the present problem. No unconstitutional element was discerned. [The majority opinion links the question of identification with the right of assembly and petition. The injunction against it, based upon the lack of registration, was there held to be a restraint on both speech and assembly. Such an issue is not involved here.] Compare also, qualifications for registration as voters, *Franklin* v. *Harper,* 205 Ga. 779 [55 S.E.2d 221], appeal dismissed 339 U.S. 946 [70 S.Ct. 804, 94 L.Ed. 1361]; upon acquittal, refusal to redeliver records made under requirement, of fingerprinting and photographing, *State* ex rel. *Mavity* v. *Tyndall* (1947), 225 Ind. 360 [74 N.E.2d 914], certiorari denied 333 U.S. 834 [68 S.Ct. 609, 92 L.Ed. 1118]; regulation of posted prices (burden is upon assailant to show invalidity), *Merit Oil Co.* v. *Director of Division of Necessaries of Life,* 319 Mass. 301 [65 N.E.2d 529]; fingerprinting and photographing taxi drivers, *Norman* v. *City of Las Vegas* (1947), 64 Nev. 38 [177 P.2d 442]; vaccination as prerequisite to admission to school, *Sadlock* v. *Board of Education* (1948), 137 N.J.L. 85 [58 A.2d 218].

In *People of State of New York* ex rel. *Bryant* v. *Zimmerman* (1928), 278 U.S. 63 [49 S.Ct. 61, 73 L.Ed. 184, 62 A.L.R. 785], a statute of the State of New York was sustained which required an organization to file with state officials its constitution, etc. and a roster of its membership. In *National Association for Advancement of Colored People* v. *State of Alabama* (1958), 357 U.S. 449 [78 S.Ct. 1163, 2 L.Ed.2d 1488], such a requirement of disclosure was held violative of the constitutional freedoms, under the facts of the case, but the court did

not overrule the Zimmerman case. It seems accepted that the names of the officials or employees of the organization could be validly required. One can find no differences between organizations, except that one was considered malignant, and the other benign, and the situation out of which the latter case evolved perhaps led to the fear that disclosure was only sought as a prelude to the deprivation of other constitutional rights; not a speculative but an imminent deprivation.

As "points along the way," such cases give no adequate preview or prediction. The constitutional restrictions are that no law shall be made "abridging the freedom of speech." No such freedom is abridged by the ordinance here in question. It has been urged in effect that not only the body of the constitutional provision but its spirit must be observed, if modern judicial trends are to be anticipated. A hundred years ago it was remarked, "Mr. Justice Daniel, of the Supreme Court of the United States, took occasion in a recent case, to disapprove of this course of reasoning, and relaxing something of the austere dignity of that august tribunal, remarked, that if the Judges were to adopt the notion that a law might be declared unconstitutional, because of its supposed repugnancy to the spirit of the Constitution, they ought to employ a rapping medium to procure authentic revelations from that spirit." *Pattison* v. *Board of Supervisors* (1859), 13 Cal. 175, 182; to which Mr. Justice Wallace added, "The 'spirit of the Constitution,' . . . would partake too much of the personal spirit of the individual Judges chosen for the time being to interpret that instrument, and, chameleon-like, it would be apt to prove white, or gray, or red, or bluish, or bottle green, as the peculiar views of those having the spirit in their keeping might give it color. . . ." *Stockton & V. R. Co.* v. *Common Council of City of Stockton* (1871), 41 Cal. 147, 162.

Counsel have been able to refer us to no authentic rapping medium to reveal where the present ordinance would be directed by the United States Supreme Court by the "points along the way." We are of the opinion that the effect upon freedom of speech is too indirect and insubstantial, as involved in this case, to require us to hold the ordinance is unconstitutional.

By virtue of United States Constitution, article VI, clause 2, the Constitution of the United States and the laws made in pursuance thereof "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any

Thing in the Constitution or laws of any State to the Contrary notwithstanding.''

In our sphere, this is our direct command, no less than that resting upon the United States Supreme Court which has jurisdiction in all cases arising under the Constitution. (Art. III, § 2, cl. 1.)

Upon the precise question in issue, the United States Supreme Court has not spoken. Under the policy announced for itself, and rather generally followed, it has undertaken to reweigh and balance the public interest and private right in each case. In a sense, this policy can never be divorced from the accompanying facts, and they, rather than a touchstone of principle, have produced holdings which may be ''points in the line'' but these are accompanied often by polemical discussion by individual members of the divided court, out of which proponents and opponents alike may find comfort, or by which the ''points in the line'' are obscured as general guides for future action. The announced policy of decision requires that a court place itself in the position of the local legislature in each case, in determining and weighing the public interest, which is at least as compelling as private right. *Cf.* Mr. Justice Frankfurter in *Dennis* v. *United States, supra,* 341 U.S. 494, 525 et seq. [71 S.Ct. 857, 95 L.Ed. 1137].

It is a salutary and just rule that courts in the first instance are entitled to rely upon the integrity of the legislative processes and of the legislators, for they too, act under the injunctions of the federal Constitution. (Const., art. VI, cl. 3.)

The wisdom of legislation is not a matter for the courts, unless on its face it is manifestly arbitrary or ultra vires. *McCarthy* v. *City of Manhattan Beach* (1953), 41 Cal.2d 879, 885-886 [264 P.2d 932]. There is a presumption that the facts justify the classification of the activity concerned and that there has been a balancing of public and private interest. *California Physicians' Service* v. *Garrison* (1946), 28 Cal.2d 790, 803 [172 P.2d 4, 167 A.L.R. 306].

The burden is upon him who asserts the invalidity of the ordinance to show such an abuse of discretion on the part of the legislators as would justify the court concluding as a matter of law that the ordinance is unduly oppressive, in consideration of his constitutional rights, and not reasonably necessary to promote the general welfare of the commu-

nity. *Minney* v. *City of Azusa* (1958), 164 Cal.App.2d 12 [330 P.2d 255]; *Serve Yourself Gasoline Stations Ass'n* v. *Brock* (1952), 39 Cal.2d 813 [249 P.2d 545], appeal dismissed 345 U.S. 980 [73 S.Ct. 1130, 97 L.Ed. 1394].

 The presumption of the constitutional validity of a statute does not disappear when the statute is challenged as violative of the First Amendment but is merely balanced by it. When the legislative body finds a public interest which justifies the banishment of anonymity, the presumption arises again in full force. Paraphrasing *National Maritime Union of America* v. *Herzog* (D.C.1948), 78 F.Supp. 146, 155, affirmed 334 U.S. 854 [68 S.Ct. 1529, 92 L.Ed. 1776].

 The presumption of reasonableness attends state action. *Salsburg* v. *State of Maryland* (1953), 346 U.S. 545, 553 [74 S.Ct. 280, 98 L.Ed. 281, 289].

 Opposition between the 14th Amendment and the ordinance should be such that a judge feels a clear and strong conviction of their incompatibility before the ordinance is declared void. *National Maritime Union of America* v. *Herzog, supra*; *Denny* v. *Watson* (1952), 114 Cal.App.2d 491, 495 [250 P.2d 692], appeal dismissed 346 U.S. 803 [74 S.Ct. 51, 98 L.Ed. 334]; *People* v. *Marine Products Co.* (1947), 77 Cal.App.2d Supp. 929 [177 P.2d 67].

 The judges in *People* v. *Arnold* did not and we now do not, have such a strong and clear conviction.

The judgment and order denying motion for new trial are affirmed.

SWAIN, J.—I concur. We have no clear-cut decision by the U. S. Supreme Court on the supposed right to publish anonymously; two of their cases which may bear on the question are conflicting. See *People of State of New York* ex rel. *Bryant* v. *Zimmerman* (1928), 278 U.S. 63 [49 S.Ct. 61, 73 L.Ed. 184, 62 A.L.R. 785], and *National Association for Advancement of Colored People* v. *State of Alabama* (1958), 357 U.S. 449 [78 S.Ct. 1163, 2 L.Ed.2d 1488]. The distinction which Mr. Justice Harlan draws between the two seems to be that the members of N. A. A. C. P. are good guys and the members of Ku Klux Klan are wicked men.

BISHOP, P. J.—I dissent. Several propositions with respect to the problem before us seem to me to stand established beyond argument, and to recognize them is to narrow the field in which reasonable minds may take opposing position. The

first is that the freedom of the press, protected by the Fourteenth Amendment and by section 9 of article I of our state Constitution, extends to the particular type of printed matter known as "handbills." It is so stated in *Lovell* v. *City of Griffin* (1938), 303 U.S. 444, 452 [58 S.Ct. 666, 82 L.Ed. 949, 954], and in *Young* v. *People of State of California* (1939), 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155], a provision of the Los Angeles Municipal Code (§ 28.01) that then declared that "No person shall distribute any handbill . . . upon any street . . ." was held to be prohibited by the Fourteenth Amendment. See further *Jamison* v. *State of Texas* (1943), 318 U.S. 413 [63 S.Ct. 669, 87 L.Ed. 869].

Then, too, the fact that the section immediately involved essays to prohibit the *distribution* of handbills, and not their *publication*, will not serve to save it. *Ex parte Jackson* (1878), 96 U.S. 727, 733 [24 L.Ed. 877, 879] ; *Lovell* v. *City of Griffin, supra,* 303 U.S. 444, 452 [58 S.Ct. 666, 82 L.Ed. 949, 954] ; *Young* v. *People of State of California, supra,* 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155].

Again, as the cases already cited clearly establish, the protection of the two Constitutions is against adverse action by city legislative bodies as well as by state legislatures.

Lastly, a mere reading of the section of the municipal code in question makes it clear that its effect is to abridge the freedom of the press (forbidden by the Fourteenth Amendment, as interpreted in the United States Supreme Court cases already cited) and to "restrain and abridge" the "liberty of the press," expressly forbidden by section 9, article I. Note the opening words of Municipal Code, section 28.06 : "No person shall distribute any handbill in any place under any circumstances. . . ." But for that which follows this would be an absolute prohibition. That which follows lifts the absolute prohibition, but only partially. Unless the name and address of the author, and of the one causing the distribution to be made, are given, there can be no distribution. The freedom of press is to that extent abridged.

Nor is this just a technical abridgement. It takes no vivid imagination to conjure up many a situation where one who sees an evil against which he would strike by written criticism, will refrain from doing so because of what he believes to be the sure consequences to himself or family if his name appears on the pamphlet. The right freely to use the printed word is not limited to those so moved that they will act regardless of consequences. The section just cannot be said not to abridge

or restrict the right freely to use the press in order to present ideas.

It must be conceded, of course, that neither freedom of speech nor of the press is immune from every restriction. It cannot be doubted that a city ordinance would escape the death penalty, imposed by the Constitution, that read: "No person shall paint any words upon the walls of any public building," and I am not overlooking the fact that the state Constitution, after declaring that "Every citizen may freely speak, write, and publish his sentiments on all subjects," added the words: *"being responible for the abuse of that right"* before it ended the sentence with the prohibition: "and no law shall be passed to restrain or abridge the liberty of speech or of the press." The responsibility is *imposed* on him who exercises the right that is given. The section does not, as suggested in *People* v. *Arnold* (1954), 127 Cal.App.2d Supp. 844, 848 [273 P.2d 711, 713-714], grant the right to those who *accept* the responsibility.

The purpose of the municipal code provision is fairly obvious; it is to make it easy for the state, or for any individual injured by a handbill, to pin the responsibility upon him who caused it to be made and distributed, by requiring him to leave a trail to his door. In order to accomplish this purpose in the relatively few instances where there has been an abuse of the right freely to communicate ideas by handbills (and plainly defendant's handbill was not obscene, libelous, nor did it otherwise abuse the right), the municipal code would impose restraint upon all occasions where it is desired to use them. I remain convinced that this may not be done.